## KENT V. THE PEOPLE.

1. As a general proposition, the objection that instructions in a criminal case were given in the language of the statute is not tenable.
2. The ingredient of malice, necessary to constitute the crime of murder under our statute, is a question of fact to be found by the jury and not a question of law to be inferred by the court.
3. The burden of proof rests upon the state to prove to the satisfaction of the jury, beyond a reasonable doubt, the existence of all the material elements necessary to constitute the crime of murder as defined by the statute.
4. The entire *res gestæ* should be laid before the jury to be considered as a whole, without distinction as to what party introduced the several matters of evidence. If, upon such consideration, a reasonable doubt exists as to the guilt of the prisoner of any crime included in the indictment, he must be acquitted. This rule includes all matters of defense growing out of the *res gestæ* which traverse the allegations of the indictment; it is only when the defendant sets up independent matters of defense, or matters in avoidance, that a different rule of evidence prevails.
5. Under the statute of 1881 the ingredient of malice must be found to exist as to both degrees of murder. The distinguishing feature between murder in the first degree and murder in the second degree is, that to constitute murder in the first degree the jury must find "premeditation," and specify the same in their verdict, whereas if said fact be not found and specified in the verdict, it is murder in the second degree.
6. A verdict of guilty must be based upon proof of the facts charged in the indictment, or upon proof of other facts and circumstances in addition to the fact of killing from which the ingredients necessary to constitute the crime can be fairly inferred.
7. Section 36 of the Criminal Code must be construed in connection with other sections of the statute which define the constituent elements

of murder especially. Thus construed, there must be the viola-
tion of a public law by the killing of a human being in the peace
of the people; in the killing there must be a union or joint opera-
tion of act and intention, and the deed must be malicious to such a
degree as to come within the expression, "with malice aforethought,
either express or implied."

8. While this statement of the offense concedes that the element of
malice may be implied, yet it is plain that the implication is to be
made by the jury from the proof of facts and circumstances suffi-
cient to warrant such implication.

9. When the circumstances surrounding the commission of the homi-
cide are produced in evidence on the part of the state, all matters,
if any, which go to justify or excuse the killing must be, by the
terms of section 36 itself, considered in favor of the defendant; and
if sufficient to manifest that the accused was justified or excused in
committing the homicide, he is not bound to prove it by affirmative
evidence in his own behalf.

### Error to District Court of Lake County.

THE facts are stated in the opinion.

Messrs. TAYLOR and ASHTON, for plaintiff in error.

Attorney-General T. H. THOMAS, for defendants in
error.

BECK, C. J. Plaintiff in error, Charles M. Kent, was
indicted at the August term, 1882, of the district court
of Lake county, for the murder of one Thomas Bennett.
The crime was committed on the 4th of July, of the
same year, in the city of Leadville, and was witnessed
by several persons. Upon the trial, which took place in
the month of November following, the prosecuting attor-
ney did not confine the testimony to the facts occurring
at the time of the killing, but called witnesses who had
knowledge of the facts and circumstances which led to
the rencounter resulting in the tragedy mentioned. It
appears from the testimony of the witnesses that, for
two or three years prior to the month of April preceding,
the deceased had as a mistress a woman familiarly known
as "Carrie Bennett." In said month of April the plaint-

iff in error married this woman, and afterwards lived
with her in Leadville.   The woman, however, appears
to have continued her dissolute life after marriage as
before.   The testimony was to the effect that she visited
low dance halls, frequented only by lewd women and
men who desired to associate with them, and that she
hired a room in a house of prostitution for the purpose
of meeting men away from her home.   According to the
testimony, all the foregoing facts were known to her
husband, including her previous life, and her immoral
conduct during the married state.   It further appears
that they were accustomed to speak of and to each other
in the most disrespectful style, using towards each other,
in public places,. the vilest epithets.

On the morning of the 3d day of July the husband
went down town with the expressed intention of going
to Gunnison, but failing in his purpose, he returned to
his rooms, and there found the deceased in bed with his
wife.   He left the room without offering any violence,.
and it appears that he went down the street and got
drunk.   Either before or after getting into this condition
he purchased a revolver, and while in his intoxicated
condition he told different persons that he had caught
Bennett in bed with his wife, and was going to kill him,
at the same time exhibiting his revolver.   To one or
more he said:   "Tell Bennett to get a gun, for I have
one, and there will be trouble when we meet."   Upon
the following day, July 4th, Kent and Bennett were seen
by several witnesses engaged in a fist fight on a sidewalk
of Harrison avenue.   Each one was dealing blows at the
other.   They were seen to "clinch," as the witnesses
termed it, and push each other about over the sidewalk
for a few minutes, when Bennett sprang from Kent, at-
tempted to run, dodged behind the witness Childs, and
attempted to interpose the body of Childs between him-
self and Kent.   The latter took a few steps forward,
leveled his revolver and fired one shot at Bennett, who

then crossed the street to the opposite sidewalk, sank down upon it, and died within a few minutes. The proof shows that the shot fired by Kent took effect in a vital portion of Bennett's body, causing death. The shooting and killing were admitted by the accused and his counsel.

The matters of defense relied upon appear to have been *provocation, heat of blood* and *self-defense*. Two witnesses testified for the defense that they went to Bennett, where he lay upon the sidewalk, and saw lying by his side a pair of brass knuckles. Witnesses visited accused in the jail, and testified that they found bruises upon his head, and one upon his cheek; also that one of his ears was bleeding from a small cut; but other witnesses who saw him about the same time at the jail did not notice these wounds. The trial resulted in a verdict of manslaughter, upon which the accused was sentenced to a term of ten years in the state penitentiary.

The errors assigned which we are asked to review relate to certain instructions given to the jury on the part of the prosecution. Forty instructions were given in all, eleven of them having been given on the part of the accused. (We would observe here that the practice of giving a great number of instructions is not to be commended, since it *tends to perplex, rather than to enlighten,* the jury.)

Among other points urged against the instructions given for the prosecution are that they were given to the jury in the language of the statute, without explanation or qualification; that some of them were not applicable to the facts of the case on trial, and that many of them were misleading to the jury. As a general proposition, the objection that instructions were given in the language of the statute is not tenable. The statutes of the state comprise the rules of state government. They are framed by the chosen representatives of the people, who are selected by the people themselves for the purpose of fram-

ing their laws. The laws so made are for the information and government of the whole people, and it is a well-known maxim that "ignorance of the law constitutes no excuse for its violation." It is, therefore, a reasonable presumption that a jury drawn from the ranks of the people know and understand the statutes of the state; and if this is a correct presumption, there can be no error in giving to them, as instructions, the statutory definitions of criminal acts, particularly if they are, as in this instance, accompanied by instructions from the court, applying the statutes to the matters in issue.

In the present case, the first instruction given on the part of the prosecution was the statutory definition of murder; then followed statutory definitions of express malice, manslaughter, justifiable homicide, what is sufficient to justify such homicide, and of self-defense.

The principal ground of error relied upon by counsel for the accused appears to be the giving of the fourth instruction on the part of the people. This instruction is a literal copy of section 36 of the Criminal Code, and is as follows:

"The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide." Gen. Laws, 267.

Counsel say: "This instruction was inapplicable to the cause on trial; that it is only applicable when the prosecution is able to prove the fact of killing without showing the circumstances of the homicide.

"That it instructs the jury that the people, having proved the killing, have made out their case, and it is then for the defendant to establish his defense by a preponderance of evidence; that evidence sufficient to create

a reasonable doubt of his guilt would not be sufficient to authorize an acquittal.

"That the court assumed by this instruction that the defendant committed the deed; that he intended to do it; that the act was committed with malice aforethought, express or implied; whereas, all these facts should have been found by the jury from the evidence.

"That the burden of proof never shifts on the defendant at any stage of the proceedings; it at all times remains on the state; that the fact that Kent and Bennett, when first seen, were fighting does not entitle the people to the presumption that Kent brought on the fight or committed a violent assault on Bennett; yet this is just what the instruction tells the jury."

We are free to say, if this section only of the statute had been given to the jury, without other sections, or other instructions plainly defining the crime of murder, and informing the jury of the nature and weight of the evidence necessary to justify a conviction, there would be strong reasons for holding that it was misleading. But such is not the fact. This section was given in connection with other sections of the statute, and with copious instructions from the court, by which the offense charged and included in the indictment, with the material elements necessary to constitute the same, were clearly defined and explained. The jury were also repeatedly informed therein that all the facts and circumstances which were necessary to make out the offense charged must be proved to their satisfaction, beyond a reasonable doubt, or a verdict of guilty would be unwarranted.

In consequence of the numerous objections urged to the giving of the fourth instruction, the same being a literal copy of section 36 of the Criminal Code, as above stated, we will give our particular attention to the consideration of this section. It was originally copied into our statutes from the statutes of the state of Illinois,

but some of the principles therein contained had their
origin far back in the history of the common law. The
application of these principles in practice has given rise
to much learned discussion, both in this country and in
England, and has resulted in differences of opinion, both
among the judiciary and commentators on common and
statutory law. A leading case upon one side of the con-
troversy in this country is *Com. v. York*, 9 Metc. 93.
This case, however, was decided by a divided court. The
interpretation arrived at by the majority of the court,
although written and announced by one of the most
eminent jurists of America (the late Chief Justice Shaw),
did not prove wholly satisfactory either to the bench or
the bar. The opinion is a lengthy one, but the doctrine
announced, as stated in the syllabus, was brief. It was:

"When, on the trial of an indictment for murder, the
killing is proved to have been committed, and nothing
further is shown, the presumption of law is that it was
malicious, and an act of murder, and proof of matter of
excuse or extenuation lies on the defendant."

The principal questions discussed related to the *burden
of proof* and *implied malice*. Upon the trial below,
after the jury had received the instructions of the court,
and had been in consultation for several hours in their
chamber, they sent into court the following question:
"Were the jury instructed by the court that the pris-
oner must prove provocation or mutual combat, and was
not to have the benefit of any doubts on the subject?"
The question was answered by the court in an instruc-
tion upon which error was afterwards assigned in the
supreme court. The rule laid down in the instruction is
thus stated in the opinion of the chief justice:

"The effect of the rule presented to the jury was that
if it was proved beyond a reasonable doubt that the de-
fendant had wilfully and voluntarily inflicted a mortal
wound upon the deceased, malice was to be inferred from
the act, unless such facts were proved, by a preponder-

ance of evidence, as would extenuate the homicide and reduce it to manslaughter. This rule seems to rest upon well-settled principles and to be supported by a great weight of authorities."

Among the citations in favor of the foregoing doctrine is a case decided in the reign of James I., wherein it was held " that, if the fact of the killing is proved, and in this proof of the homicide no excuse or extenuation appears, no other proof of malice need be given. The malice is proved by the act, and a conviction of murder must necessarily follow. It is an act done *malo animo*, and without excuse or justification which can be proved."

The rule as to the burden of proof laid down in the *York Case* was based largely upon the practice formerly prevailing in respect to special verdicts. Under that practice the jury were required to find the facts which had been proved in the case according to established rules of evidence, and the court pronounced the law arising thereon.

Chief Justice Shaw, in referring to this practice, says: " In cases of special verdicts the jury do not in terms find that the homicide was malicious, nor do they return negatively that there was no provocation or sudden quarrel. They return the facts; of course the facts proved, and no others. If, upon these facts, the court conclude that there was a homicide with malice, judgment is rendered for murder, because, whether malicious or not, is matter of law. * * * From this view of the immemorial usage of the courts upon special verdicts, it appears manifest that the fact of the killing is *prima facie* evidence of malice, and, unless overcome by preponderating proof the other way, it must be held murder, and judgment go accordingly."

He further states the doctrine to be that proof beyond a reasonable doubt is necessary to establish a fact against the accused, but preponderating proof is sufficient to establish a fact in his favor, and illustrates the principle

by considering how the case would stand on a special verdict. In such case only facts in favor of the accused which were proved by a preponderance of testimony could be returned by the jury, and those not so established would not be considered in the case.

Foster's Crown Law is also referred to, and quotations like the following taken therefrom: "I have already premised that whoever would shelter himself under the plea of provocation must prove his case to the satisfaction of the jury."

"Justification or excuse," says Judge Shaw, "must depend on the existence of facts, and such facts must be proved and found in order to be the basis of any judicial decision."

By way of illustration of the rule laid down in the instruction, and indorsed by the court, he said: "Suppose a party indicted for manslaughter, and the defense should be excusable self-defense. Suppose the fact of killing should be clearly proved, but an attempt to prove a previous violent attack upon him by the deceased should fail, although the evidence might tend to raise some doubt whether there was not such previous attack. The conviction in such case must rest on proof establishing the *corpus delicti* beyond reasonable doubt, although the whole evidence would raise a doubt whether there had not been such previous attack. The proof establishing the necessity for such taking of life in self-defense must be satisfactorily made out. Raising a doubt would be insufficient."

If the foregoing was the doctrine of the common law in respect to the legal *inference* of *malice*, from the mere act of killing, and in respect to the *burden of proof* in cases of homicide, the doctrine has certainly been modified by our statute. It is our opinion that the ingredient of malice necessary to constitute the crime of murder under our statute is a question of fact to be found by the jury, and not a question of law to be inferred by the

court. We are also of opinion that the burden of proof rests upon the state to prove to the satisfaction of the jury, beyond a reasonable doubt, the existence of all the material elements necessary to constitute the crime of murder as defined by the statute. We further hold that to enable the jury to return a true verdict, in accordance with the oath to be taken by them severally, and as an act of impartial justice to the prisoner, the entire *res gestæ* should be laid before the jury, to be considered as a whole, without distinction as to what party introduced the several matters of evidence; and if upon such consideration a reasonable doubt exists as to the guilt of the prisoner of any crime included in the indictment, he must be acquitted. This rule includes all matters of defense growing out of the *res gestæ* which traverse the allegations of the indictment; also that it is only when the defendant sets up independent matters of defense, or matters in avoidance of the allegations of the indictment, that a different rule of evidence prevails.

Our Criminal Code defines the elements necessary to constitute either a crime or a misdemeanor as follows:

"Section 1. A crime or misdemeanor consists in the violation of a public law, in the commission of which there shall be a union or joint operation of act and intention or criminal negligence.

"Sec. 2. Intention is manifest by the circumstances connected with the perpetration of the offense, and the sound mind and discretion of the person accused."

It defines "murder" to be "the unlawful killing of a human being, in the peace of the people, with malice aforethought, either express or implied." Gen. Laws, § 613. "Express malice" is defined to be "that deliberate intention unlawfully to take away the life of a fellow creature which is manifest by external circumstances capable of proof." Id. § 614. Implied malice is thus defined: "Malice shall be implied when no considerable provocation appears, or when all the circumstances

of the killing show an abandoned and malignant heart."
Id. § 615.   As our statute stood at the time of the com-
mission of the homicide in the present case, the amend-
ment of March 1, 1881, was in force.   An indictment for
murder in the first degree, as in this case, included also
murder in the second degree and manslaughter.   The
penalty for murder in the first degree was then, as now,
death by hanging; but, to authorize a judgment imposing
such penalty, it was required by the statute that the jury
trying the cause should indicate in their verdict of guilty
that the killing was deliberate or premeditated, or was
done in the perpetration or attempt to perpetrate some
felony.   This statute further provided that any person
found guilty of murder, without an indication in the
verdict whether the killing was deliberate or premedi-
tated, or was done in the perpetration or attempt to per-
petrate some felony, should be sentenced to confinement
in the penitentiary for and during such person's natural
life.

These provisions of the act of 1881 had previously been
inserted in the act of 1870, and under that act they were
fully considered by this court in the case of *Hill v. Peo-
ple*, 1 Colo. 436, wherein the opinion of the court was
rendered by Chief Justice Hallett.   It is there said that
the words "deliberate and premeditated" refer to the
specific intent with which the act was done; also, that
they are used to denote the action of the mind, and in-
volve the idea of thought and reflection; that to consti-
tute murder in the first degree the killing must be
accompanied by a premeditated or specific intention to
take life, and if such a specific intention did not exist,
the offense was murder in the second degree.

The opinion further holds that whether such intention
existed or not was, by the terms of the act, referred to
the jury; and from these considerations the court holds
that the specific intention to take life is matter of fact,

to be found by the jury, and is not an inference or presumption of law.

We fully indorse this reasoning, but it is our opinion that the same rule of evidence prevails under the statute in the case of murder in the second degree. The same reasons, substantially, exist; for, as we have seen, in order to constitute any crime, however trivial, there must be the violation of a public law, in the commission of which there must be a union or joint operation of act and intention, or criminal negligence. *Buckner v. Commonwealth*, 14 Bush, 601–604; *Roberts v. People*, 19 Mich. 414.

The ingredient of malice must be found to exist as to both degrees of murder. The distinguishing feature between murder in the first degree and murder in the second degree, as held in *Hill v. People, supra*, is, that to constitute murder in the first degree the jury must find "premeditation," or a specific intent to take life, and specify the same in their verdict; whereas, if said fact be not found and specified in the verdict, it is murder in the second degree.

But aside from this distinguishing feature, the same elements are necessary to constitute the crime of murder in either degree. In both cases there must be the violation of a public law, in the commission of which there must be a union or joint operation of act and intention; there must also be the unlawful killing of a human being in the peace of the people, and such killing must be with malice aforethought.

The existence of these elements is to be found by the jury trying the cause, either from the proof of circumstances which manifest a deliberate intention unlawfully to take away life, or as inferences of fact to be drawn from the circumstances attending the killing, which clearly indicate either that no considerable provocation operated on the mind of the slayer, or that he acted under the impulses of an abandoned and malignant heart.

The jury is sworn to return a true verdict, according to the evidence. A verdict of guilty must, therefore, be based upon proof of the facts charged in the indictment; or upon proof of other facts or circumstances in addition to the fact of killing, from which the existence of the ingredients necessary to constitute the crime can be fairly inferred. Evidence short of this will not authorize a conviction under the provisions of our Criminal Code.

The presumptions and inferences just mentioned are not presumptions of law, but of fact, to be drawn by the jury from the evidence of facts and circumstances attending and surrounding the commission of the homicide. *Farris v. Com.* 14 Bush, 371; *Stokes v. People*, 53 N. Y. 177–180; Bish. Crim. Law, 673*b;* Prof. Jury Trial, § 331. Mr. Wharton, in his work on Homicide, mentions, among other presumptions of fact, the inference of criminal intent or malice drawn from an illegal act, and says that presumptions of this class are of fact, and not of law, and are simply logical inductions. Whart. Hom. § 645.

Judge Hallett, in the case above cited, says:

"If a person deliberately use a deadly weapon in a manner likely to produce harm, upon every principle by which we may judge of motives of men we may say that he intends to destroy life, and we determine this psychological fact from our experience of the operations of the mind; and therefore we think this a natural presumption, as distinguished from a legal presumption."

Mr. Bouvier thus defines presumptions of fact:

"Presumptions of fact are inferences as to the existence of some fact drawn from the existence of some other fact; inferences which common sense draws from circumstances usually occurring in such cases." "Presumptions of fact are derived wholly and directly from circumstances of the particular case, by means of the common experience of mankind."

Referring now to section 36 of the statute, which provides that, "the killing being proved, the burden of

proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounted to manslaughter, or that the accused was justified or excused in committing the homicide," we observe that this section, considered by itself, might be held, under the rule laid down in the case of *Com. v. York, supra,* to announce a different rule from that which could be derived from the other provisions of our statute above quoted, and to be in conflict therewith. Section 36, so construed, would authorize a presumption of law from the act of killing alone, which would, of its own force, constitute the crime of murder, and authorize a verdict of guilty of that offense, unless there was other proof on the part of the prosecution which would rebut such legal presumption. Such a construction, however, would render the section wholly inconsistent with all other provisions of our Criminal Code; from which it is reasonable to infer that no such construction was ever intended, but that the design of our law-makers was that it should be construed in connection with the sections defining the elements of the crime mentioned.

The doctrine announced in the *York Case* does not, in any degree, rest upon the statutes of the commonwealth of Massachusetts, but is derived wholly from the principles and rules of decision found in the common law. In proof of this statement, we quote the words of Chief Justice Shaw himself, who says: "But our statutes nowhere define murder or manslaughter. They do not declare what acts shall constitute either of the offenses, nor what acts of homicide shall be deemed justifiable or excusable. We are, then, obliged to seek for these rules and principles in the common law."

The opinion traces the law of murder, and the rules of presumption concerning it, back to ancient times. The curious historical fact is mentioned in this connection

that " in the times of the Danes, and afterwards in the
times of the Normans, certain arbitrary presumptions
were, by express enactment, to be raised.   Homicide was
not then considered murder unless it was secret.   Among
other extraordinary provisions, it is stated that, before
the statute of Marlbridge, as the law stood or was inter-
preted, if a man was found to be slain secretly, it was
always intended: 1. That he was a Frenchman; 2. That
he was killed by an Englishman; 3. That the killing was
murder; 4. That if any one was apprehended to be the
murderer, he was to be tried by fire and water [*i. e.*, by
ordeal], though he killed him by misfortune."

Justice Wilde, in his dissenting opinion in the same
case, in commenting upon the presumption of law laid
down by the court, that the fact of the killing alone,
when nothing else was shown, constituted murder, says:
"Such a presumption is not supported, as it seems to me,
by any binding authority; it had its origin in a barbarous
age, when the rules of evidence, as now established, were
little known or very much disregarded."

Perhaps this presumption had the same origin as the
presumption referred to by Chief Justice Waldo, of Ore-
gon, in *State v. O'Niel*, 9 West Coast Rep. 158, which he
says was unheard of since the time of the Stuarts, quot-
ing in illustration of those times the observation of Mr.
Justice Stephens, in his history of the criminal law of
England, that " a criminal trial in those days was not
unlike a race between the king and the prisoner, in which
the king had a long start and the prisoner was heavily
weighted."

It is our judgment, based upon the foregoing consider-
ations, that section 36 of our statute must be construed
in connection with other sections of the statute which
define the constituent elements of crime generally, and
the elements of murder specially.   Thus construed, to
constitute the crime of murder in either degree there
must be the violation of a public law by the killing of a

human being in the peace of the people; in the killing there must be a union or joint operation of act and intention; and the deed must be malicious to such a degree as to come within the expression or phrase, " with malice aforethought, either express or implied."

While this statement of the offense concedes that the element of malice may be implied, yet it is plain that the implication is to be made by the jury trying the cause from the proof of facts and circumstances sufficient to warrant such implication. Malice, in such case, is an inference of fact, and not of law. *Hopps v. People*, 31 Ill. 392.

The supreme court of Michigan say, in *Wellar v. People*, 30 Mich. 20, that " there is no rule recognized as authority which allows a conviction of murder where a fatal result was not intended, unless the injury intended was one of a very serious character, which might naturally and commonly involve loss of life or grievous mischief." The court further say that any doctrine which would hold every assailant as a murderer, where death follows his act, would be barbarous and unreasonable. Mr. Wharton, in his work upon Criminal Evidence (section 738), says the doctrine that malice and intent are presumptions of law, to be presumed from the mere act of the killing, belongs, even if correct, to purely speculative jurisprudence, and cannot be applied to any case that can possibly arise before the courts; that in no case can the prosecution limit its proof to the mere act of killing.

The several sections of the statute being construed together, as we think they must be, it is evident that before the accused can be convicted of murder, or called upon to produce evidence in justification or mitigation of such an offense, the prosecution must make out such a case as will, under the law, *sustain a verdict of guilty.* Proof of the mere abstract fact that the accused killed the deceased will not sustain such a verdict. Such proof

does not establish the material elements of the crime of murder. To give the killing the legal character of murder it must have been done with malice aforethought. This necessary ingredient cannot be inferred from the act alone, but must be proved, or circumstances of the killing proved from which it can be inferred as a fact in the case. The *averment* of the killing alone, in the indictment, would be bad, and evidence limited to such abstract fact as "A. killed B." would be inadmissible as stating simply an opinion. The state must go further, and prove the essential elements of the crime charged.

In *Maher v. People*, 10 Mich. 217, the court say: "Homicide, or the mere killing of one person by another, does not of itself constitute murder. It may be murder or manslaughter, or excusable or justifiable homicide, and therefore entirely innocent, according to the circumstances or disposition or state of mind or purpose which induced the act. It is not, therefore, the act which constitutes the offense or determines its character, but the *quo animo*,— the disposition or state of mind with which it is done."

It is necessary, therefore, to constitute murder under a state statute, that the killing be done in the mode described by the statute. It is only when, in addition to the "killing," facts and circumstances attending or surrounding the homicide are laid before the jury that the necessary inferences of fact to complete the crime can be rightfully drawn. Whart. Crim. Ev. § 738. The last-mentioned author further says: It is perfectly proper to tell a jury that from certain circumstances, as the use of a deadly weapon, severe wounds or threats, intent and malice may be rightly inferred as inferences of fact.

In regard to the use of a deadly weapon, Mr. Bishop says: "As a general doctrine, subject to some qualifications, the malice of murder is conclusively inferred from the unlawful use of a deadly weapon, resulting in death." 2 Bish. Crim. Proc. sec. 680.

An instruction to this effect was given in *Clem v. State*, 31 Ind. 484, which was held to be erroneous and at variance with principles which have received the uniform sanction of all the courts in this country and Great Britain.  The objection was that it was not a conclusive presumption; for, if such, no evidence would be admissible to show that the act was done in necessary self-defense, or that the killing was excusable and not felonious. .

In *Head v. State*, 44 Miss. 735, it is said: " The use of a deadly weapon is *prima facie* evidence of malice, because a man must be taken to intend the necessary and usual ,consequences of his act.  To shoot, or stab, or strike with a bludgeon, indicates a purpose to take life; but if the one or the other be employed to disable an adversary in the very act of making a murderous and malicious assault, then the presumption is overcome.  *  *  * To use a deadly weapon justifies the inference that the accused meant to kill, but whether he was excusable on the ground of self-defense depends on the facts and circumstances with which he was environed at the time."

If a person deliberately uses a deadly weapon on another, it must be inferred from the circumstances showing the deliberation that it was malicious.  Such circumstances fully authorize the jury to- find the ingredient of malice.  The inference is not drawn from the use of the weapon only, but from the proof of its deliberate use.

One of the objections urged by counsel for defendant Kent to the giving of section 36 as an instruction to the jury is that it is only applicable when the prosecution is able to prove the fact of the killing, without showing the circumstances of the homicide.

This objection results from an erroneous view of the statute.

. When the circumstances surrounding the commission of the homicide are produced in evidence on the part of the state, as it is conceded they were in this case, all mat-

ters, if any, which go to justify or excuse the killing must be, by the terms of the section itself, considered in favor of the defendant; and if sufficient to manifest that the accused was justified or excused in committing the homicide, he is not bound to prove it by affirmative evidence in his own behalf. The duty of the jury in such case would be to inspect and consider the evidence with respect to its sufficiency to establish the crime. It would also be their duty to examine and weigh the same with respect to matters of mitigation, justification or excuse; and if, upon the whole evidence, a reasonable doubt existed in the minds of the jury as to the guilt of the defendant, it would be their duty to return a verdict of not guilty. *Alexander v. People*, 96 Ill. 96.

The proposition of defendant's counsel that the burden of proof never shifts on the defendant at any stage of the proceedings is not strictly correct. It is true the state must prove the offense charged beyond a reasonable doubt. The statute then casts the burden of proof as to matters of mitigation or excuse upon the defendant. The public prosecutor cannot be compelled to search for and put in evidence all the facts connected with the transaction, or exculpatory facts in the prisoner's favor. The policy of the law, as evinced by the presumption of innocence and the doctrine of reasonable doubt, would require the public prosecutor to introduce such proof as will give a fair account of the transaction. This being done, it devolves upon the defendant to produce in evidence such matters of mitigation, justification or excuse, if any such exist, as may tend to explain his action and show the necessity therefor; otherwise a verdict of guilty must necessarily be returned against him. He is not required by the statute, however, to prove such circumstances beyond a reasonable doubt, or to the extent of satisfactorily establishing his defense. He is only required to prove the same as any other facts are required to be proved; and if the matters relied on be supported

by such proof as would produce a reasonable doubt in the minds of the jury as to the guilt of the prisoner, when the whole evidence concerning the transaction comes to be considered by the jury, the rule of law is that there must be an acquittal. *Alexander v. People,* 96 Ill. 96.

It is but fair to the jury, upon whom is cast the grave responsibility of determining the prisoner's guilt, as well as his fate in respect to life or liberty, that all the facts comprising the *res gestæ* should be spread before them; and when we consider that every man is presumed to be innocent until his guilt is made to appear beyond a reasonable doubt, and that the burden of proof to this extent rests upon the state, it is but fair to the prisoner that the whole transaction, and not a select part of it, should be before the jury to be considered by them as the evidence in the case, and not as the evidence of contesting *parties* in the case. Criminal prosecutions are not to be regarded or conducted as contests between individuals respecting civil rights, wherein advantages not reaching the merits may be gained by one party over another. The policy of the government is to punish only those who violate the law, and to protect the innocent in all cases. Usually the character of the crime is demonstrated by the same evidence which establishes it; and, if the accused is compelled to give in evidence some of the attending circumstances, the same rule should be applied as if the whole had been frankly presented by the state. It may therefore be laid down as the established doctrine of this state, that, as to all facts in evidence properly constituting part of the *res gestæ*, they are to be considered by the jury, in passing upon the question of guilt or innocence, without discrimination as to the rules of evidence, whether introduced by the prosecutor or the defendant. *Hill v. People,* 1 Colo. 452; *State v. Porter,* 34 Iowa, 140; Roscoe's Crim. Ev. (7th ed.) 135.

In *Maher v. People, supra,* it is held that, in criminal

prosecutions, the whole of the *res gestæ* should be before the jury, so as to show the real nature, state of mind, and intention with which the act was done; that the object of the trial should be to show the real nature of the whole transaction, whether its tendency be to establish guilt or innocence. It is there suggested that any inference drawn from a detached portion of an entire transaction may be entirely false.

In *Wellar v. People, supra,* the court held it to be the duty of the prosecutor, in cases of homicide, to call those witnesses who were present, at the transaction, or who can give direct evidence on any material branch of it, unless, possibly, where too numerous.

In *Hurd v. People,* 25 Mich. 406, attention was called to a fact often overlooked by courts as well as prosecuting officers, that "a public prosecutor is not a plaintiff's attorney, but a sworn minister of justice, as much bound to protect the innocent as to pursue the guilty, and he has no right to suppress testimony."

The last case further holds that the burden of proving the *res gestæ*, or whole transaction, so far as the evidence thereof is attainable, rests on the prosecution.

Section 36 of our Criminal Code does not require the prosecution to prove the entire transaction, as is required in some of the above cases, but in view of the several provisions of the statute we hold that when the proof relating to the *res gestæ* is produced it is then to be considered as a whole, regardless of the fact that both parties were concerned in its production.

A different rule of evidence prevails when the defendant enters upon an independent defense, and attempts to prove extrinsic facts, not arising out of the *res gestæ*, in justification or excuse, or in avoidance of the averments of the indictment. The rule is that when the defense set up is, in itself, purely extrinsic, the allegations of the indictment not being denied, it is necessary that such defense be sustained by a preponderance of proof.

Defenses of this character are licenses, authority from the state, former conviction, former acquittal, once in jeopardy, compulsion of any kind, and, in general, defenses which do not traverse the indictment, but are in avoidance of the allegations thereof.

The extent to which the proof must go in making out an independent defense has been the subject of much discussion, some authorities holding that it is sufficient in any case to create a reasonable doubt of guilt, while others favor the doctrine that the defense must be made out to the satisfaction of the jury. The rule laid down in Wharton's Criminal Evidence, sec. 331, is that when the case of the prosecution is admitted, and the defense is one exclusively of avoidance, then this defense must be made out by the defendant by a preponderance of proof; to which he cites many authorities. He applies this rule to all facts set up by the defendant which do not traverse any averment of the indictment. In illustration of the rule he says:

"When the defendant sets up that he acted under necessity, *e. g.*, under command of a superior officer in the time of war, or under compulsion of any kind, the burden is on him in such cases to prove the defense he sets up, and he must establish this by a preponderance of proof, it being an extrinsic defense." Id. § 335. See, also, *State v. Murphy*, 33 Iowa, 278; *Com. v. Boyer*, 7 Allen, 306.

We are of opinion that the rule sanctioned by these authorities is well supported, and states the correct doctrine as to independent defenses.

The rule relating to the *res gestæ*, which we have been considering, applies to all defenses which traverse the averments of the indictment and go to the essence of the guilt charged against the accused. Within this class may be mentioned self-defense, provocation, heat of blood, and, generally, all matters growing out of the *res gestæ* which go to justify, extenuate or excuse the crime

charged, including the defense of *alibi*. Some authorities hold an *alibi* to be an independent defense, not coming within the rule mentioned, but the weight of authority is against this view. The later authorities hold it to be an essential averment of the indictment that the accused was present and committed or participated in the commission of the offense; hence this averment must be established by the prosecution beyond a reasonable doubt, and if the proof leaves it doubtful in the minds of the jury whether the defendant was present at or absent from the place at the time the crime was committed, he must be acquitted. *Turner v. Com.* 86 Pa. St. 73; *Howard v. State*, 50 Ind. 190; *Pollard v. State*, 53 Miss. 416; Whart. Crim. Ev. § 333.

In respect to the defense of insanity, so much conflict of authority exists that we will express no opinion as to what class of defenses it belongs. In the case now being considered no independent defense was set up. The defendant relied wholly upon facts arising out of the *res gestæ*, traversing the averments of the indictment, in which case the rule obtains that if the jury entertain a reasonable doubt as to the existence of any essential ingredient necessary to constitute an offense charged or included in the indictment, as to that defense the defendant is entitled to an acquittal. The instructions given were in accordance with the rule of law in such cases.

We have carefully examined all the errors assigned and not abandoned in the submission of the case as advanced upon the docket, and are of opinion that the defendant was not prejudiced by the matters complained of therein. The instructions given by the court were favorable, rather than otherwise, to the defendant, especially in respect to the defenses by him relied upon. The jury were sufficiently advised as to maxims of law concerning the burden of proof, reasonable doubt, and the presumption of innocence. It would seem, also, from the character of the verdict returned, in view of the adverse nature of the

testimony produced, considered as a whole, that the jury adopted that humane principle of the law, applicable in many cases, that if it is doubtful whether the prisoner be guilty of a greater or less offense, he is only to be convicted of the latter. Perceiving no error in the record, judgment will be affirmed.

*Affirmed.*