· No. 19,521.

William K. Leonard *v.*
The People of the State of Colorado.
(369 P. [2d] 54)

Decided February 26, 1962.

Mr. Edward A. Jersin, for plaintiff in error.

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Deputy, Mr. Richard A. Zarlengo, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Sutton delivered the opinion of the Court.

Defendant is here by way of writ of error from a sentence of three to five years for voluntary manslaughter. He assigns as error certain instructions which the trial court gave and certain instructions which it refused to give.

Pertinent parts of the defendant's version of the events leading up to the homicide in question are as follows: Defendant had known Lester Reeves, the victim, for five or six years. Their wives had become friends in Denver and from this the husbands became friends. The Leonards had two teenage children and both families visited back and forth even after the Reeves moved to Colorado Springs where Mr. Reeves became first a fireman and later a gardener for the United States Airforce Academy.

On the evening of October 15, 1959, defendant left his home in Denver, Colorado, and drove to Reeves' home in Colorado Springs, the two having previously arranged to leave on a big game hunting trip the same day. After arriving at Reeves' home they set out in Reeves' pick-up truck for a hunting camp at High Tower Mountain near

Rifle, Colorado. Just outside of Colorado Springs they stopped to buy a supply of liquor and beer.

Reeves, the original driver, was drinking throughout the trip and after several hours on the road the defendant took over the driving due to Reeves reckless driving. The trip itself was interspersed with several drunken outbursts of temper on the part of Reeves including swearing, threats to throw defendant from the truck and name calling directed to defendant and a filling station attendant where they stopped for gasoline. The two men, however, finally arrived at the hunting camp at approximately 7:30 a.m. the following day, October 16th, where defendant pitched camp and made the two of them comfortable. After sleeping several hours Reeves awoke about 10 a.m. and again started drinking. In the afternoon he decided to drive to the nearby town of Silt for gasoline. The defendant accompanied him part way, but while on the road observing that Reeves was very drunk, got out of the truck over Reeves' vigorous protests and returned to camp by himself. Reeves continued on to Silt and returned at approximately 6 p.m. At this time Reeves became belligerent and argumentative, in fact so troublesome that defendant decided to forego the hunting venture entirely and asked Reeves to drive him to Silt where he, defendant, could obtain transportation back to Denver. Reeves consented to do so, but while on the road he continued drinking. Defendant's statement to the Assistant District Attorney following his going to the police, and which was introduced in evidence, was that on at least two occasions Reeves threatened him while they were on the road to Silt, his statement being that Reeves "* * * kept getting more intoxicated. He threatened me several times. He stopped the car once and grabbed me and said he would tromp me into the ground, he would kill me, he could do it anytime he felt like it * * *." Defendant's statement as to the second threat was that it happened about two miles further on. Finally due to his intoxicated condition Reeves asked

defendant to take over the wheel, defendant did so and they arrived at Silt at approximately 8:30 p.m.

Only the defendant could describe these events, except for isolated parts, since no one else was present, and no witnesses having seen the killing he alone testified as to how it occurred. His account of the tragedy as related to the assistant district attorney was as follows: Upon arriving at Silt defendant parked the truck in a cafe parking lot.

"Q. * * * Then what happened? A. We were both in the car and I started to open the door on my side to get out. Reeves jumped out of the truck on his side and charged around the back of the truck. The next thing I knew I was out of the cab. He had me by the shirt, or jacket up by the throat and starting shaking me back and forth. He said 'I will kill you, you son of a bitch.' I struggled to free myself. He kept pushing and pulling me from the driver's side of the car clear around to the other side, shoving me and pulling me, saying 'I will kill you, you son of a bitch, I will stomp you and beat you against the side of the cab until you are dead.' At that point I just don't know what happened. The next thing I know I had gotten the knife out of my jacket and we were struggling and I was trying to back away. That is the last thing I can recall. I don't remember opening the knife or anything. He staggered back from me. He didn't say anything. He got back into the pickup at that time. I went around to the driver's side, opened the door and climbed in and sat down and I looked in my hand and had the knife. I actually don't remember actually stabbing him. Other than that I had the knife and felt that I must have. I remember closing the knife blade and putting it in my pocket. Q. When he was shaking you did you receive any blows on the had (sic)? A. Yes, on the back of the head when he was shaking me against the canopy of the truck body. He was shaking me like a terrier would shake a rat. He shook me back bouncing me off the cab. Q. Last night when I talked to you I noticed a slight knot

on your head. Was this a result of hitting something? A. I don't know, it wasn't there before, but things were so hectic that I couldn't tell you."

Upon realizing what had happened defendant immediately sought help and upon the advice of a waitress in the cafe the defendant drove Reeves to Rifle, Colorado, about seven miles away, in quest of the nearest doctor. In Rifle defendant found two policemen and explained to them that he had stabbed Reeves. Shortly thereafter, in the hospital, Reeves was pronounced dead from loss of blood. Defendant was arrested and subsequently brought to trial for murder.

At the close of the prosecution's case defendant moved for an acquittal and at the conclusion of all the evidence he moved that the question of murder in the first and second degree be taken from the jury on the ground that there was insufficient evidence to support any such verdict. The court denied the motions and instructed the jury on the law of murder in the first and second degree, voluntary and involuntary manslaughter, and excusable and justifiable homicide. The jury returned a verdict of guilty of voluntary manslaughter. The defendant is here by writ of error seeking reversal. In essence he asserts the following:

1. A motion for a directed verdict should have been granted at the conclusion of the people's case; likewise a verdict of not guilty should have been directed as to murder in the first and second degree at the close of all the evidence because there was no evidence of wilfulness, deliberation, premeditation, intent or malice;

2. The giving of instructions on involuntary manslaughter, after instructions on murder and voluntary manslaughter, both of which are felonies and involve the question of intent, confused the jury since involuntary manslaughter is only a misdemeanor and involves killing without intent to do so;

3. The court refused to instruct the jury that since defendant offered evidence of self-defense, the burden of

proof thereby devolved upon the prosecution to prove beyond a reasonable doubt the non-existence of self-defense; instead the court instructed that once the killing was proved the burden of proving circumstances of mitigation, justification or excuse devolved upon the accused, unless the prosecution's proof sufficiently manifested that the crime committed amounted only to manslaughter, or that the defendant was justified or excused;

4. The court refused to instruct the jury that in self-defense the defendant alone is the judge of whether he is in danger of death or great bodily harm; instead the court instructed that the defendant's apprehension of imminent danger was to be measured by the standard of the reasonable and prudent man in the same circumstances.

We will address ourselves to these contentions in the above order.

I.

First, as to whether a directed verdict should have been granted at the conclusion of people's case.

 The record indicates that there was sufficient evidence to go to the jury as to the question of voluntary or involuntary manslaughter. This is so because the evidence is that Reeves was highly intoxicated at the time he was stabbed and defendant was somewhat under the influence himself at the time. The jury could have found, as it did by its verdict, that though considerable provocation existed, defendant used unreasonable force, i.e., a deadly weapon, to resist the assault.

We therefore conclude that in this state of this record a directed verdict was properly denied.

Second, as to whether this record supports the instructions given on first and second degree murder.

C.R.S. '53, 40-2-1 states: "Murder — defined — how committed. — Murder is the unlawful killing of a human being with malice aforethought, either express or implied. The unlawful killing may be effected by any of the various means by which death may be occasioned."

C.R.S. '53, 40-2-2 states: "Malice — how manifested. — Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof."

And, C.R.S. '53, 40-2-3 relating to "Implied malice — degree of murder — when jury to fix penalty" provides in pertinent part: "Malice shall be implied when no considerable provocation appears, or when all circumstances of the killing show an abandoned and malignant heart."

▮ Viewing the evidence and the circumstances disclosed by this record, no express malice is shown to bring the charge within 40-2-2, and no abandoned or malignant heart is shown to place defendant under the pale of the second part of 40-2-3 as quoted. We must then determine whether malice can be implied on the theory that "no considerable provocation appears."

What are the facts? Here is a defendant who had in effect befriended Reeves and considered him his friend. On this trip when Reeves not only could not resist drinking to excess but became belligerent and quarrelsome, he thought first of protecting his friend by driving for him when he could get him to allow him to do so, making camp for him, seeing that he ate and telling him he should not drive when intoxicated. He refused to ride with him when Reeves was intoxicated as a protection against his unpredictable conduct. All this being to no avail he thought only of getting away from his companion and returning home before some accident happened.

We must keep in mind that threats such as Reeves made to kill defendant were uttered by a strong bodied drunken man in a mountainous area with few other people around, and by a man who was able to carry them out. Guns, ammunition and hunting knives were readily available to him as equipment after they left Colorado Springs on this hunting trip. In addition, while defendant was driving at night Reeves had reached over and turned off the ignition and threatened to throw him from

the truck. The fact that the truck in which they were riding was Reeves' to crash or wreck with the parties in it as the spirit might move him, only served to enhance defendant's fear of bodily harm at the hands of deceased.

Under such circumstances defendant had a right to be afraid and testified that he was. It is only in the people's contention that the fatal termination of the trip did not occur as defendant testified it had, that raises any doubt as to whether Reeves assaulted defendant in a manner that justified the use of the pocket knife in self-defense.

The sheriff's testimony was that on the day following the killing he had examined the truck and found the dust on it undisturbed. He also indicated that he could not find where defendant said Reeves had fallen down when out of the truck at the time of the second alleged threat by Reeves to kill defendant on the way to Silt.

There is one important apparent inconsistency between what witness Robert H. Walker, a state patrolman, testified defendant told him on the night of the killing and what defendant himself related in his statement the following day and which he reaffirmed at the trial.

Walker testified that defendant had told him that Reeves had doubled up his fists to strike him and that he then drew his pocket knife and stabbed him, whereas defendant's pre-trial statement, which was introduced by the people, as well as defendant's trial testimony, was that Reeves had seized him before defendant struck the fatal blow.

We point out that it was dark at the times in question. Just where the truck was stopped on the way to town in a drive of several miles along a strange country road obviously might not be found with ease, if at all, when the sheriff looked for it later. This is especially true since no noticeable marks might have been left there by Reeves and defendant. As to there being no fresh marks on the dusty truck body, as testified to by the sheriff, it seems obvious that when a man is suddenly seized in a dark parking lot by someone who is drunk and who had

threatened to kill him, that he could have hit his head on the open truck door or some other part of the vehicle as well as on the cab where he thought he was shoved and where no apparent mark was left on the truck's dust. The fact is that there was a contusion on defendant's head from some blow. Also, it is not necessarily conflicting to say that Reeves had doubled up his fists to strike and that he had seized defendant — for the first could reasonably precede the latter.

The gist of the people's position is that defendant had developed a hatred for Reeves due to his continual abuse and threats and had then deliberately murdered him. The people's evidence on these important points was in part defendant's own admittedly incomplete statement taken down by the assistant district attorney soon after the death occurred plus some testimony. None of it shows that the events had not happened generally as defendant had described them. The most that was shown was a possibility that part of defendant's recitation of events had not happened exactly as recalled by him. The difficulty with the people's position here is that it is contrary to the established rule that if the jury entertained a reasonable doubt of the defendant's guilt it was its "duty to acquit him, although they (it) might not believe from the evidence the facts and conditions, or any of them * * *" as shown by defendant. See *McRae v. People*, 101 Colo. 155, 71 P. (2d) 1042 (1937). In other words it was the people's burden to make out a case that would have sustained a verdict of guilty of first or second degree murder before the prosecution was entitled to such instructions. *Kent v. People*, 8 Colo. 563, at p. 578, 9 Pac. 852 (1885). "Proof of the mere abstract fact that the accused killed the deceased will not sustain such a verdict.", i.e., one based on such instructions, *Kent*, supra.

This court has long recognized that there is real danger to a defendant in instructing upon higher degree of homicide when the evidence will not support such instruc-

tions. For example in *In Re Losasso,* 15 Colo. 163, at page 170-71; 24 Pac. 1080 (1890), Mr. Chief Justice Helm stated in regard to a grand jury indictment for murder that: "It is a fact that prosecuting officers, actuated by motives of policy, generally endeavor to procure indictments for the higher rather than for either of the lesser grades of homicide. An indictment for murder is, not without reason, supposed to render a conviction of manslaughter more certain. On the other hand, under the charge of manslaughter, a conviction for murder would be impossible; yet the evidence adduced at the trial may greatly exceed in strength that upon which the indictment was found, and fully warrant such conviction. In theory, these considerations should have no weight either with the prosecutor or grand jury; but in practice, we know that they often turn the scales in favor of the graver accusation."

■ In view of the state of evidence in this record it was error for the trial court to have determined that there was no considerable provocation or danger to defendant in this situation. It follows too that it was error to give instructions on first and second degree murder when there was insufficient evidence to have sustained a conviction of such charge if one had been returned thereon. *Tate v. People,* 125 Colo. 527, 247 P. (2d) 665 (1952).

## II.

Defendant next contends that the instructions on involuntary manslaughter, following instructions on murder and voluntary manslaughter, confused the jury because involuntary manslaughter is a misdemeanor and does not involve the question of intent. We find this contention to be without merit.

■ The court instructed the jury that "involuntary manslaughter shall consist in the killing of a human being without any intent to do so; in the commission of an unlawful act or a lawful act which probably might produce such a consequence in an unlawful manner * * * ."

In his brief defendant argues that it is inconceivable that a set of facts could be murder and also manslaughter. However, the criteria of the propriety of the questioned instructions is not whether a set of facts could be murder *and* manslaughter, but rather whether such facts could establish murder *or* manslaughter.

We cannot agree that no instruction on involuntary manslaughter should have been given under the facts as shown by the evidence.

### III.

The defendant's next assignment of error concerns the giving of instruction No. 18. This instruction was taken verbatim from C.R.S. '53, 40-2-20, and is as follows:

"The killing being proved, the burden of proving circumstances of mitigation, or that justify or excuse the homicide, will devolve on the accused, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter, or that the accused was justified or excused in committing the homicide."

Defendant's argument is that the giving of this instruction, without his additional tendered instruction No. 30, had the effect of shifting the burden of proof and required the defendant to prove his innocence. The rejected instruction was as follows:

"In this case the defendant has offered evidence of self-defense. When such defense is offered it devolves on the state to prove beyond a reasonable doubt that the alleged justification of self-defense did not exist."

At the outset we should state that when instruction No. 18 was given the defendant made no objection or exception. However he did except to the court's refusal to give the tendered instruction. He also excepted to the giving of instruction No. 9, which in effect stated that when the killing is done with a deadly weapon, malice may be legitimately inferred in the absence of proof that the act was done in necessary self-defense, or upon sufficient provocation or cause.

 For reasons that are hereinafter set forth we conclude that the cumulative effect of the court's failure to give a proper instruction to replace defendant's tendered instruction No. 30, and the giving of instructions Nos. 9 and 18 deprived the defendant of the right to an acquittal on the ground of self-defense if upon that issue the jury had a reasonable doubt as to whether he acted in necessary self-defense.

The following reasons lead to the above conclusion:

 It is axiomatic that the burden of proof rests upon the prosecution throughout the trial to prove beyond a reasonable doubt the existence of all essential elements necessary to constitute the offense charged. "The burden is never on the defendant to show that he did not commit the crime * * * ." 1 *Anderson, Wharton's Criminal Evidence,* §10 (12th ed. 1955). It is not incumbent upon the defendant to prove anything to the satisfaction of the jury; rather, it is sufficient if he, by any evidence in the case, succeeds in raising a reasonable doubt in the minds of the jury of the truth of any essential element of the charge against him. *Zipperian v. People,* 33 Colo. 134, 79 Pac. 1018 (1905). The reasonable doubt which authorizes an acquittal is as to the defendant's guilt, not his innocence.

Nor does C.R.S. '53, 40-2-20, place upon the defendant the burden of proving his innocence. It merely places upon him the burden of raising a reasonable doubt as to his guilt by evidence of mitigation, justification or excuse.

These principles were early recognized in *Kent,* supra. *Kent* contains a lengthy discussion on the burden which the defendant must meet under the instructions here at issue; a restatement of only the most significant passages will sufficiently satisfy our purposes:

"The proposition of defendant's counsel that the burden of proof never shifts on the defendant at any stage of the proceedings is not strictly correct. It is true the state must prove the offense charged beyond a reason-

able doubt. The statute then casts the burden of proof as to matters of mitigation or excuse upon the defendant. The public prosecutor cannot be compelled to search for and put in evidence all the facts connected with the transaction, or exculpatory facts in the prisoner's favor. The policy of the law, as evinced by the presumption of innocence and the doctrine of reasonable doubt, would require the public prosecutor to introduce such proof as will give a fair account of the transaction. This being done, it devolves upon the defendant to produce in evidence such matters of mitigation, justification or excuse, if any such exist, as may tend to explain his action and show the necessity therefor; otherwise a verdict of guilty must necessarily be returned against him. *He is not required by the statute, however, to prove such circumstances beyond a reasonable doubt, or to the extent of satisfactorily establishing his defense. He is only required to prove the same as any other facts are required to be proved; and if the matters relied on be supported by such proof as would produce a reasonable doubt in the minds of the jury as to the guilt of the prisoner, when the whole evidence concerning the transaction comes to be considered by the jury, the rule of law is that there must be an acquittal.* * * * .

" * * * Criminal prosecutions are not to be regarded or conducted as contests between individuals respecting civil rights, wherein advantages not reaching the merits may be gained by one party over another. The policy of the government is to punish only those who violate the law, and to protect the innocent in all cases. Usually the character of the crime is demonstrated by the same evidence which establishes it; and, if the accused is compelled to give in evidence some of the attending circumstances, the same rule should be applied as if the whole had been frankly presented by the state. *It may therefore be laid down as the established doctrine of this state, that, as to all facts in evidence properly constituting part of the res gestae, they are to be considered by the jury,*

374

*in passing upon the question of guilt or innocence, without discrimination as to the rules of evidence, whether introduced by the prosecutor or the defendant.* * * * .

"The rule relating to the *res gestae,* which we have been considering, applies to all defenses which traverse the averments of the indictment and go to the essence of the guilt charged against the accused. Within this class may be mentioned *self-defense,* provocation, heat of blood, and, generally, all matters growing out of the *res gestae* which go to justify, extenuate or excuse the crime charged, including the defense of *alibi."* (Emphasis added.)

In the case at bar there was no elucidation by the court upon instruction No. 18; it merely reiterated the exact words of the statute.

■ While generally the giving of instructions in the language of the statute is proper, this is not the case when the statute itself, as here, may tend to create ambiguities and lead to confusion in the minds of the jurors as to the burden cast upon the defendant in a criminal case. *Kent* recognized the misleading effect upon the jury of the statute and of an instruction based thereon when standing alone. Although the court in *Kent* found that no error was committed, it explicitly noted that the instructions in that case were accomplished by other instructions applying the statute to the matters in issue when it said: "We are free to say, if this section only of the statute had been given to the jury, without other sections, or other instructions plainly defining the crime of murder, and informing the jury of the nature and weight of the evidence necessary to justify a conviction, there would be strong reasons for holding that it was misleading."

In *Kent* the court pointed out at page 576 of the Colorado Report that this statute if construed literally and not in connection with the sections defining the elements of the crime mentioned" * * * would render the section wholly inconsistent with all other provisions of our

criminal code; from which it is reasonable to infer that no such construction was ever intended * * * ." We have only recently reaffirmed the principle that instructions must be geared to the case which is being tried. Also, see *Rumley v. People,* 149 Colo. 132, 368 P. (2d) 197.

There was no such necessary amplification in the case at bar. Absent such instruction the jury, on the basis of the instruction actually given, might reasonably have concluded that the burden was on the defendant to prove self-defense beyond a reasonable doubt, or by a preponderance of the evidence, and upon his failure to do so believed that it had a duty to convict under the instruction as given. Or, the jury might reasonably have concluded that although the evidence on the part of the prosecution established justification or excuse, it did not do so beyond a reasonable doubt nor by a preponderance of the evidence, and its duty in such case was to convict. Finally, it might have believed that it was not to cumulate the prosecution's evidence with that of defendant on mitigation, justification or excuse, but was to consider defendant's evidence exclusively in determining whether the prosecution's evidence had been overcome, even though the prosecution's evidence did not conclusively or satisfactorily establish such factors. In any of these situations the jury would have been imposing upon the defendant a burden which he is not required to bear. As previously stated his only burden was to raise a reasonable doubt in the minds of the jury as to his guilt from all the evidence of the case. This should have been made clear by further amplification of instruction No. 18; otherwise it would be impossible for the jury to properly apply this instruction to the evidence presented.

That further amplification was necessary is apparent in light of an additional instruction given by the court. The court by instruction No. 9 instructed that when a killing is done with a deadly weapon, malice may be legitimately implied in the absence of proof that the

act was done in necessary self-defense. Although at the outset the court gave the standard instructions that nothing is presumed or implied against the defendant, and that he must be proved guilty beyond a reasonable doubt, the cumulative effect of instructions Nos. 9 and 18 was to impose upon the defendant the burden of proving that no crime was committed notwithstanding he had admitted the stabbing. Any instruction, whatever its langauge, which in effect imposes upon the defendant the burden of affirmatively showing that no crime has been committed constitutes reversible error, since it clearly deprives him of the benefit of a reasonable doubt as to his guilt which may arise from all the evidence. 3 *Underhill, Criminal Evidence,* §660 (5th ed. 1957).

In his brief defendant relies upon *Eckhardt v. People,* 126 Colo. 18, 247 P. (2d) 673 (1952), to sustain the proposition that his tendered instruction No. 30 should have been given. The court in *Eckhardt* did use similar language but it was addressing itself to the problem of the prosecution's burden of proof in sustaining an assault and battery charge, a question not present here. Moreover under C.R.S. '53, 40-2-20, it is clear that some burden is upon a defendant. We therefore do *not* hold that it was error to refuse the tendered instruction though some supplementary instruction on this matter should have been given.

IV.

Defendant also raises the question of the standard of conduct applicable to a killing in self-defense.

Here the trial court by instruction No. 15 instructed the jury in pertinent part as follows:

"You are instructed that a defendant may be justified in taking human life if it appeared to him at the time, *and would have so appeared to a reasonable and prudent person under the same circumstances,* that his life was in imminent danger, or that he was in imminent danger of receiving great bodily harm, although he was not in fact in danger; * * *."

Instruction No. 13 as given provided:

"You are further instructed that a man has a right to defend himself against the unlawful assaults and attack of others and may repel force by force. He is not required to retreat but may pursue his adversary until he has secured himself from such danger; and he is to estimate the danger and he is justified in acting upon the circumstances as they reasonably appeared to him at the time and may have appeared to a reasonable person."

And, instruction No. 17 stated in pertinent part:

"You are instructed that self-defense is not available * * * unless there is evidence tending to show that he either was or appeared to be menaced * * * by some overt act on the part of the assailant, *of a character to create a reasonable apprehension of danger to his life, or of great bodily harm* * * *." (Emphasis added.)

 Defendant assigns as error the Court's refusal to give his tendered instruction No. 31 which stated that in resorting to self-defense, the defendant "alone is the judge of the danger, and is justified in acting under the circumstances as they appeared to him at the time * * *." Suffice it to say that no error was committed by the trial court in refusing to give this tendered instruction, for those given adequately covered the subject and conformed to the statutory wording.

In summary we conclude that:

1. Instructions on murder were improper in this case based upon this record.

2. Instructions on involuntary manslaughter were properly submitted to the jury.

3. Supplementary instructions relating to proof of mitigation, justification or excuse should have been given.

4. The instructions given on the apprehension of danger as governed by the reasonable man standard were proper.

The judgment is reversed and the cause remanded with directions to grant a new trial to be conducted in consonance with the views herein set forth.

Mr. CHIEF JUSTICE DAY and Mr. JUSTICE MOORE concur in the result.

Mr. JUSTICE HALL dissents.

MR. JUSTICE MOORE concurring in the result:

THE opinion of the majority results in a reversal of the judgment of the trial court.

I agree that the judgment should be reversed, however I further am of the opinion, after having carefully considered the entire transcript of the evidence, that the motion made by counsel for defendant for a directed verdict of not quilty of any offense should be granted.

MR. CHIEF JUSTICE DAY authorizes me to state that he concurs in these views.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

From the opinion it would seem that the majority of this court accept defendant's self-serving declarations, repeated by the People's witness, and his own testimony to the effect that he acted in self defense, as conclusive proof of the facts surrounding the killing.

If such were proper, then the only thing the trial judge could do would be to conclude, as does the defendant, that the killing was in self defense and no crime committed. To approve such a doctrine could well result in a directed verdict of not guilty in all murder cases where there are no eye witnesses to the killing. All a defendant would have to do would be to take the witness stand and testify that he acted in defense of his life and that would end the matter.

In *Leopold v. People*, 105 Colo. 147, 95 P. (2d) 811, this court said: "Further, where pertinent, the question of intent must be determined from all the circumstances connected with the perpetration of the offense in which

declarations of the defendant, while a part of the panorama, have no special or controlling effect. * * *."

Here, we have a killing — defendant admits that he wielded the deadly weapon which produced the death. Such evidence is sufficient, in my opinion, to sustain a verdict of guilty of any degree of murder or manslaughter. The killing at the hand of the defendant having been established, then it was up to the defendant, if he so chose, to seek to justify his actions and to produce evidence sufficient to raise a reasonable doubt in the minds of the jury as to his guilt. This the defendant here undertook to do — just how far he succeeded was for the jury to determine under proper instructions. This problem is one for resolution by the jury, not the trial judge or this court.

The verdict of the jury in this case is indicative of the fact that the jury took defendant's story with one or more grains of salt. Had the jury accepted his story as true, as the majority of this court apparently accept it, then they could have, and under the instructions given should have, found the defendant not guilty.

I am of the opinion that the defendant was given the benefit of all doubts, the jury were properly instructed and they and they alone were empowered to resolve the factual questions presented, and I find no sanction for this court to pass on the credibility of defendant's witnesses or the weight to be attached to their testimony.

The judgment should be affirmed.