# No. 16,757.

## ECKHARDT *v.* THE PEOPLE.
(247 P. [2d] 673)

Decided June 23, 1952.

Messrs. DICKERSON, MORRISSEY & ZARLENGO, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. H. LAWRENCE HINKLEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for the people.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

PLAINTIFF in error, who will be called defendant, was, by a jury, on September 8, 1950, found guilty of assault and battery under a two-count information filed February 2, 1950, charging voluntary manslaughter and assault and battery. January 12, 1951, after motion for new trial had been overruled, defendant waived application for probation and was sentenced to the county jail for a term of eight months. Pending appeal, bond was fixed at $3,000.

Errors that are assigned are: 1. Verdict of the jury is contrary to the evidence in that it fails to establish beyond reasonable doubt the material allegations of the offense of which defendant was convicted; 2. Submitting both counts of the information to the jury and refusing to require the people to elect; 3. Error in submitting the charge of involuntary manslaughter; 4. Error in permitting the people to call witnesses on rebuttal who testified concerning matters which were part of the people's case

in chief; 5. The giving and refusal of certain instructions.

The incident occurred at a poolhall in Ault, Weld county, Colorado, known as the "H and R Poolhall." Late in the afternoon of January 31, 1950, defendant went into the poolhall after a visit to a dentist in Greeley in the morning; he is a farmer living near Ault; about forty years of age; married, and the father of three children. He drank a beer or two, and about 5:30 o'clock P. M. went to a single occupancy toilet in the rear of the building and while there, a stranger to defendant, who, it later developed, was Maurico Valdez, opened the toilet door and began to molest defendant; an argument resulted; defendant says Valdez threatened to cut his throat; and while no blows were struck, there was a struggle between the two in pushing one another toward the front part of the poolhall, where the bartender ordered the two to go outside if they were going to do any fighting; no blows were struck at this time in the poolhall, but Valdez said to defendant if he wanted to fight, "Let's go outside." Defendant was wearing a long overcoat and Valdez was wearing a lumber jacket. Valdez pulled off his coat and then defendant did likewise. Defendant went out the front door of the poolhall, closely followed by Valdez; defendant had just turned around when he was "struck at" by Valdez, either missing him or just grazing him; thereupon defendant hit Valdez on the head with his fist, knocking him to the ground. The conflicting testimony is on the question of whether Valdez had gotten back up on his feet and was raising his arm as if to strike defendant, or whether he was on his hands and knees or on one hand and knee when defendant struck him a second blow on the head and he went down and did not get up, whereupon defendant went back into the poolhall. The fracas was witnessed by several people in the poolhall who were looking through the window or the glass door with vision partly blocked, all of whom testified, creating the conflict in the testimony as to the second blow. Defendant testified that Valdez

was on his feet and about to strike him when defendant hit him the second time.

Valdez did not move after going to the ground the second time; a doctor was called and pronounced him still alive; he apparently died immediately thereafter, and was dead when the coroner arrived.

Valdez was a man of larger build than defendant, about sixty-six years old, and from outward appearances strong and healthy, but apparently in bad physical condition as disclosed from the testimony of Dr. Frances McConnell Mills, a Denver pathologist. To state the substance of her testimony briefly is to say that she found slight abrasions on the head and left hand; internal examination disclosed that the coronary arteries of the heart were tortuous and thickened; marked hardening of the arteries; examination of the head revealed the inside lining was intact and no sign of a fracture, but there was an extensive hemorrhage, which was the cause of death, resulting from a break in the arteries which could have been the result of a blow to the head, or, in the advanced stage of arteriosclerosis, resulting from extreme exertion, extreme anger, or extreme excitement.

So far as proof is concerned, this leaves the cause of death a matter of speculation, and, of course, wholly lacking of sufficient proof that death was the result of anything other than generally natural causes.

█ The information charged voluntary manslaughter, a felony, in one count; the second count charged assault and battery, a misdemeanor, and any reason for separately charging this misdemeanor is not apparent. Counsel for defendant presented a motion for directed verdict on each count at the conclusion of all the evidence. At the suggestion of the district attorney, the court removed voluntary manslaughter, but left involuntary manslaughter and assault and battery to go to the jury after the defense had moved to require the people to elect between the two counts. It was error for the court to deny a dismissal of the first count of the infor-

mation. It was further error to instruct the jury as to involuntary manslaughter, under the evidence in the case, which was wholly lacking in proof and insufficient to support a verdict of guilt, because such verdict would necessarily rest on conjecture as to the cause of death. Proof of the necessary elements of manslaughter was lacking and it was error to instruct on manslaughter if it was not sustained by the evidence. *Battalino v. People,* 118 Colo. 587, 199 P. (2d) 897; *Smith v. People,* 120 Colo. .39, 206 P. (2d) 826. Earlier cases relied upon by defendant in error did advance the rule that such error was cured if the defendant was not found guilty of the charge erroneously submitted; however, this situation existing in this jurisdiction was clarified by the latest pronouncement of this court on that question in the case of *Tate v. People,* No. 16769, 125 Colo. 527, 247 P. (2d) 665, decided May 5, 1952, in which the following is to be found: "The fact that the trial court gave an instruction on first degree murder when the essential elements are missing in the proof, it must be said that the jury could easily infer by the giving of such an instruction that these elements were present in the case. It presents a fertile field for discussion among jurors not skilled in legal technique, for finding a welcome opportunity to compose differences and agree upon a compromise verdict. We must say that it was prejudicial error under the circumstances of this case to give the instruction on first degree murder in the absence of proof of the necessary elements."

Throughout the defense, the thread of self-defense runs clearly as to both counts of the information. Aside from the possible confusion, or undue intimation caused by an instruction on involuntary manslaughter, which was improperly given, it no doubt could have had prejudicial effect on the jury in considering the nature of the true elements of assault and battery contained in the second count. The fact that since a death occurred, the jury could easily conclude that the court believed suffi-

cient evidence of a fatal assault was present and to be considered by the jury. It seems inescapable that the average jury would feel that the charge of assault and battery, which they were considering, was of such an aggravated character that death resulted and such would naturally reflect itself in a verdict on that count.

■ After the close of defendant's case, the district attorney called three witnesses whose names were not endorsed on the information, who were housewives of Ault, and sitting in an automobile parked directly across from the scene of the tragedy. These witnesses were called in rebuttal in the words of the district attorney, "the sole purpose of this witness is to testify to two specific things that were testified to by the defendant and to rebut those statements as made by the defendant." With no further explanation as to what the "two specific things" were, the district attorney asked them to tell what they saw, which, of course, would be an eye-witness account of the altercation and a part of the case in chief. It is true that the testimony of these witnesses, improperly admitted under the circumstances, did disclose a contradiction of the defendant's testimony concerning the position of deceased when he struck the last blow. The other parts of their testimony concerned the entire transaction and were properly objectionable upon rebuttal. Had the district attorney asked these witnesses the specific questions concerning the incident of the position of deceased when struck by defendant, that would have been proper rebuttal and admissible as such; however, the effect of their testimony when they related everything they observed was that it was an additional and last version added to the prosecution's case and the whole of their testimony was erroneously admitted over timely objections. Of course, our statute, section 455, chapter 48, '35 C.S.A., regarding the endorsement of witnesses among other things, provides, "* * * But this shall not preclude the calling of witnesses whose names or the materiality of whose testimony is first learned by the

district attorney *upon the trial.*" Nothing in the evidence here discloses any indication of there being other witnesses or their names that might give material testimony, therefore, the district attorney did not learn of the existence of these witnesses by anything that occurred on the trial. It appears that one of these witnesses was served with a subpoena to appear and testify. The district attorney made no application to the court to endorse them as witnesses, and, of course, when the district attorney attempted to have them testify as to the entire transaction, the court should have promptly confined the district attorney to the specific matters which he proposed to rebut and failing to do so, it was prejudicial to the interests of defendant, and error. There is nothing to indicate that defendant knew of the existence of these witnesses, and it follows, was taken by surprise by this turn of the prosecution's method. Rebuttal testimony "should consist of nothing which could have been offered in chief." 53 American Jurisprudence, page 107.

██ As to some matters involved this seems to be a case of first impression in this jurisdiction, namely, the matter of charging a misdemeanor offense of assault and battery in an information, the first count of which is homicide, and also the question of defense as to mutual combat. The circumstances here have some of the features of mutual combat in the last analysis, and, of course, that involves the question of who was the aggressor in the final combat. It is uncontradicted that deceased started the provocation by accosting defendant in the toilet for no apparent reason whatever, since they were strangers to each other up to that moment. Then followed some scuffling into the main portion of the poolroom, where they were ordered out by the bartender if they wanted to fight. It is not too clear all that was said by either or both; however, at the suggestion or direction of the bartender, each removed his outer coat and proceeded to the outside, where, in a sense, deceased was again the aggressor by attempting the first blow.

Ordinarily the defense of self-defense in strictly mutual combat is not allowable, but a limitation on the right of self-defense does not arise alone from the fact that the two parties here were mutually engaged in a fist fight. An agreement to combat and finish their troubles must exist and must be in the nature of an antecedent agreement to so fight. *Carson v. State,* 89 Tex. Crim. 342, 230 S.W. 997. We have no such clear-cut agreement. There is indication of a mental resolve to that end when they both took off their coats. However, when the circumstances, as here, were a general follow-up of an aggression created by the deceased there must be a more definite agreement established than is to be found in the evidence to create a situation of a mutual combat. Of course, in a mutual combat each participant may be prosecuted criminally. However, in the instant case, in the final analysis, it was a matter of defendant defending himself against a continuing aggression and defendant had no assurance that the aggression was over with until the deceased either showed indications of abandonment of the altercation, which he had started, or defendant had subdued him. If there is a sense or ground of respectability required to be shown in an altercation similar to that which occurred here, the boundary is so obscure or uncertain that the defendant should not be held to criminal responsibility unless he employed unusual and uncalled for violence. He cannot, under the circumstances here, be held guilty because he did not run away. In some instances, retreat is exacted before taking life. If he was in fear of the continuation of the aggression deceased had started, then, when it was evident to him that the aggression still was imminent when deceased either was up on his feet or attempting to get up and when defendant administered the final blow, the claims of self-defense is clearly established, relieving defendant of criminal liability.

As to the matter of charging a misdemeanor offense of assault and battery in an information, the first count of

26

which is homicide, we are forced to admit that the course to be followed is not clearly established by statute or by any decision of this court. Our statute concerning the joinder of offenses is section 450, chapter 48, '35 C.S.A. and reads as follows: "Whenever there are or shall be several charges against any one person or persons for the same act or transaction, or for one or more acts or transactions connected together, or for one or more acts or transactions of the same class of crimes or offenses, which may be properly joined, instead of having several indictments, the whole may be joined in one indictment in separate counts, and if two or more indictments are found in such cases the court may order them consolidated."

█ This statute is undoubtedly clear as to the joinder of charges growing out of the same transaction or transactions that are connected; however, "transactions of the same class of crimes or offenses, which may be properly joined, * * *" presents a debatable question when a felony and misdemeanor are joined. The same acts cannot at the same time constitute a felony and a misdemeanor; the crime must be one or the other, not both.

█ It is generally well settled that crimes are classified either as treason, felonies or misdemeanors. In statutory offenses where the legislature does not classify the crime as a felony or a misdemeanor, the classification is accepted and apparently fixed and determined by the penalty imposed. If the penalty is imprisonment in the state penitentiary, it is considered a felony, and if by fine or imprisonment in the county jail, a misdemeanor.

█ In the instant case, the two counts, of course, relate to the same transaction, but they do not relate to the same class of crime. The fact that the court finally charged on involuntary manslaughter, which is a misdemeanor, does not alter or change the question presented because the information as filed and as remained throughout the case, contained a first count of felony and

second count of misdemeanor. This does not present two degrees of the same crime, but it initiates a crime of a different class. So far as this state is concerned, this situation may require legislative correction. The practice of joining a felony with a misdemeanor, has, in some isolated cases, undoubtedly been followed, and technically speaking, we cannot say that it is forbidden, or that such practice is precluded by our present statute. However, when we consider that under our statutes, in a case of homicide, assault and battery is not one of the offenses as of an inferior degree, and in the present case, we disapprove of the practice of joinder as herein found and say that it is a manifest mockery of the rights of the state and of the cause of justice to inject into this case the final question of assault and battery and subject defendant to the wide-open inducement, and almost an invitation, to the jury to bring about a miscarriage of justice by the easy route of assault and battery in order to obtain a conviction.

In summation, when, as it was here shown by the prosecution's evidence, that the death might have been from natural causes, or on the other hand, due to the criminal agency, the proof of death cannot thus rest in the disjunctive and was clearly and entirely out of this case and should have been so considered by the trial court and no instructions submitted that would confuse the jury on that question. And again, we believe the evidence here is insufficient to sustain the verdict of the jury of assault and battery. In criminal prosecutions the burden is on the state to show that accused was not acting in self-defense. When such defense is offered, it devolves on the state "to prove, beyond a reasonable doubt, that the alleged justification did not exist." 6 C.J.S. 975. We believe sufficient proof and some of the elements are lacking, and when coupled with errors in the trial and instructions given, the verdict cannot stand.

For the reasons assigned, the judgment is reversed.