THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. GEORGE DOYLE AND MONA DOYLE, DEFENDANTS-
APPELLANTS.

Argued February 4, 1964—Decided May 18, 1964.

*Mr. Frank G. Schlosser* argued the cause for defendants-appellants (*Mr. Maurice M. Krivit*, attorney).

*Mr. William C. Brudnick*, Assistant Prosecutor of Bergen County, argued the cause for plaintiff-respondent (*Mr. Guy W. Calissi*, Prosecutor of Bergen County, attorney).

The opinion of the court was delivered by

FRANCIS, J.  Defendants Dr. George Doyle and his wife, Mona Doyle, were convicted of committing a criminal abortion upon one Pauline Fealey in violation of *N. J. S.* 2A:87–1. The Appellate Division affirmed. *State v. Doyle,* 77 *N. J. Super.* 328 (*App. Div.* 1962). Appeal as of right was taken to this Court under *R. R.* 1:2–1(a). The basis for resort to the rule was alleged violation of the Fourth Amendment to the *United States Constitution* which prohibits unreasonable searches and seizures. More specifically, defend-

ants claimed the search of their home by police officers on the night of the abortion, and the seizure of certain articles therein which were used in evidence against them at the trial transgressed that amendment. Certain additional trial errors were raised and disposed of adversely to the Doyles in the Appellate Division. The contentions relating to them were renewed in this Court.

On the original argument of the appeal before us, we were convinced that the seized articles were inculpatory in character and their admission in evidence sufficiently prejudicial as to require reversal of the conviction if the seizure was unlawful. See *Fahy v. Connecticut*, 375 *U. S.* 85, 84 *S. Ct.* 229, 11 *L. Ed. 2d* 171 (1963). On the argument, however, certain additional circumstances were brought to the fore which, in our judgment, required remand of the record to the trial court for the taking of further testimony with respect to the search and seizure problem. *State v. Doyle*, 40 *N. J.* 320 (1963).

The criminal offense occurred on December 2, 1960. The trial began on June 6, 1961, consumed 23 days and was completed on June 29, 1961. On June 19, 1961 the United States Supreme Court decided *Mapp v. Ohio*, 367 *U. S.* 643, 81 *S. Ct.* 1684, 6 *L. Ed. 2d* 1081 (1961). The day after *Mapp* came down, the prosecutor introduced certain inculpatory evidence which had been seized at the Doyle home on December 2, 1960. When the offer was made defense counsel conceded they were not questioning the lawfulness of the search. But, after conviction and sentence, the constitutionality of the search and seizure was questioned on appeal to the Appellate Division. The explanation for failure to raise the question during the remaining nine trial days after the *Mapp* decision, or before sentence, was that counsel did not become aware of the change in the law resulting therefrom until after the appeal was taken. The explanation was amplified by testimony on the remand referred to, and we have concluded that it should be accepted in order to dispose of the case on the merits of the constitutional issue.

As our earlier *per curiam* opinion recited, the record revealed that when defense counsel said at the trial they did not attack the propriety of the search and seizure, the prosecutor refrained from adducing evidence to demonstrate its legality. Consequently we felt that justice called for a remand to the trial court to permit both State and defense to bring forward all pertinent evidence of the circumstances surrounding the search of the Doyle home and the seizure of the articles produced at the trial, as well as any proof which the State claimed established that the search and seizure were incidental to a valid arrest of the Doyles. 40 *N. J.*, at *pp.* 324–325.

Following the remand considerable testimony was introduced with respect to the circumstances of the arrest and its relationship to the search and seizure. At the conclusion of the hearing, the trial court found that the police officers, although acting without an arrest warrant, had made a lawful arrest in the early morning of December 3, 1960 because they had reasonable ground to believe that a felony had been committed by the Doyles. He further held that the search and seizure were incidental to the arrest and therefore also lawful. The additional testimony and findings have been returned to us, argument has been had thereon, and we now have the entire matter for determination.

The complete record, original and supplemental, adequately supports the conclusion of the trial court. It appears that on November 29, 1960 the county court issued a warrant to search the Doyle residence "in the daytime or in the evening at any time prior to midnight" within ten days. The affidavit on which it was based was palpably insufficient in the light of *Mapp v. Ohio, supra,* and more particularly, *State v. Macri,* 39 *N. J.* 250 (1963). For that reason the warrant has been disregarded in our determination of the appeal.

The police officers had information that an abortion was to be performed in the Doyle home on December 2, 1960. As a consequence they had the premises under surveillance. About

ten minutes after eight in the evening a Ford automobile bearing New York registration plates drove up to Dr. Doyle's address. Two women, later identified as Mrs. Pauline Fealey and Mrs. Robert Intrieri, left the car and entered the house. Around midnight they emerged. Mrs. Fealey was helped down the porch steps and into the car by Dr. Doyle. Mrs. Intrieri got into the driver's side of the car and they drove away. A police car stopped the Intrieri vehicle after it had traveled a short distance. The officer operating the patrol car brought Mrs. Intrieri to the nearby car of Captain Walter H. Spahr of the prosecutor's office, who was in charge of the investigation. A conversation ensued in which Mrs. Intrieri told the captain that Dr. Doyle had just performed an abortion on Mrs. Fealey. She had been present and had assisted in the operation by holding one of Mrs. Fealey's legs while Mrs. Doyle held the other. Captain Spahr and Mrs. Intrieri then returned to the Intrieri car and talked with Mrs. Fealey. On being informed of the Intrieri statement, Mrs. Fealey admitted that Dr. Doyle had aborted her and that she had paid $150 to his wife, Mona Doyle, for the operation. Spahr then ordered that she be taken to the county medical officer's office for examination.

Immediately after Mrs. Fealey had been driven away, Captain Spahr asked Mrs. Intrieri to return to the Doyle house with him and Detective Kikkert, and ring the bell for them. She agreed to do so and on arriving there, they were met by two other police officers, Morrissey and Krause. At Spahr's direction, the three officers stationed themselves on the Doyle porch and Mrs. Intrieri rang the bell. In response, the porch light went on and the front door was opened by the foster son of the Doyles. When this occurred, the officers went in. The time was about 12:20 A. M. Morrissey was first and the testimony shows that as they entered, Detective Kikkert said, "We are from the police." Also, as they started up the stairs to the Doyle apartment which was on the second floor of what apparently is a two-family house, Morrissey called out that

they were police officers. Dr. Doyle was standing at the top of the stairs and as Morrissey neared, he kicked him. Morrissey pushed the doctor against the wall and held him momentarily. Officer Krause then took hold of his arm. Further identification was given and shortly thereafter, the search warrant was produced. (One of the grounds of appeal presented to us is that since the entry and search took place shortly after midnight, the warrant had no legal efficacy because of the time limitation adverted to above. In view of the result reached, it is not necessary to discuss the problem and it is reserved. See *R. R.* 3:2A–6(b).) Dr. Doyle was taken to the kitchen at the direction of Captain Spahr (who had waited across the street until the entry was made). As one officer put it: "I took Dr. Doyle into the kitchen and kept him in custody." Mrs. Doyle apparently had gone or was about to go to bed when the police entered the house. She appeared and obviously was nervous and excited. The testimony is in conflict as to whether she was in pajamas or dressed except for her shoes. She wanted to go to the bathroom but, on learning that no search had been made as yet, Spahr refused to allow her to leave her position in the hallway. The various rooms in the house were then searched and the articles, later introduced at the trial, were found. It is undisputed that Dr. and Mrs. Doyle were allowed no freedom of movement from the time the officers entered until the search was completed. (The doctor was permitted, however, to give his wife a sedative.) In the course of the search of the apartment and particularly of the kitchen, the officers seized, among other things, a garbage pail, disposable syringe wrappers, disposable syringes, an empty container, an ampoule of pitocin, a partly filled bottle of hydrocortone, a partly filled ampoule of penicillin and depromedrol, a blood-stained medical-type gown, and some newspapers and gauze stained and clotted with blood (which proved on test to be of the same type as Pauline Fealey's). Upon completion of the search, the doctor and his wife were taken to the prosecutor's office.

## I.

The State contends that even though the offense was not committed in the presence of the police officers, the search and seizure of the articles offered in evidence at the trial were proper as incidents of a lawful arrest. Defendants, on the other hand, urge the arrest was unlawful because the officers had no arrest warrant and no probable cause existed for an arrest without a warrant. They contend also that the Fourth Amendment of the Federal Constitution was violated because the search and seizure followed an unannounced intrusion by the police officers into the Doyle home. There is no occasion in this case to consider when and for what type of offense police officers may arrest without a warrant for an infraction of the penal law committed in their presence. It is undisputed that the crime charged against defendants was not committed in the officers' presence. Thus, the only question we deal with is whether their offense was such that under the existing circumstances the officers were justified legally in making an arrest without a warrant.

We are satisfied, as was the trial court on the remand, that the restraint of the persons of the defendants and the restriction of their liberty of movement by the police officers almost immediately upon the entry into the apartment, constituted an arrest. *Henry v. United States,* 361 *U. S.* 98, 103, 80 *S. Ct.* 168, 171–172, 4 *L. Ed. 2d* 134, 139 (1959); *Earl v. Winne,* 14 *N. J.* 119, 127 (1953). Moreover, the testimony shows clearly that the arrest preceded the search. Ordinarily the sequence is important because the validity of an arrest without a warrant cannot be judged by what a search revealed. The right to arrest must pre-exist the search. Officers cannot search in order to arrest, nor arrest because of the product of the search. A search undertaken merely for the purpose of uncovering evidence with which to arrest and convict of crime is not made lawful because the desired evidence is obtained. *Henry v. United States, supra.* Absent a valid search warrant, they must arrest validly in which event

they may search reasonably as an incident of the arrest. *Preston v. United States,* 376 *U. S.* 364, 84 *S. Ct.* 881, 11 *L. Ed. 2d* 777 (1964); *Ker v. California,* 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed. 2d* 726 (1963); Annotation, 94 *L. Ed.* 671 (1950).

■ This is not to say that where an arrest is valid independently of, and is not made to depend on, the search or its result, evidence produced by a search will be suppressed simply because in precise point of time the arrest does not precede the search. It is sufficient if the valid arrest and search are reasonably contemporaneous, that is, they occur as parts of a single transaction, as connected units of an integrated incident. In such a setting a search should not be condemned as constitutionally unreasonable. See *Husty v. United States,* 282 *U. S.* 694, 700, 51 *S. Ct.* 240, 241, 75 *L. Ed.* 629, 632 (1931); *State v. Hoover,* 219 *Or.* 288, 347 *P. 2d* 69, 89 *A. L. R. 2d* 695 (*Sup. Ct.* 1959); *Henry v. United States, supra* (361 *U. S.,* at *p.* 106, 80 *S. Ct.,* at *p.* 173, 4 *L. Ed. 2d,* at *p.* 141) (dissenting opinion); Annotation, 89 *A. L. R. 2d* 715 (1963). Likewise, if the arrest without a warrant is lawful the search and seizure are not invalidated solely because the officers had adequate time to procure a search or arrest warrant. *United States v. Rabinowitz,* 339 *U. S.* 56, 70 *S. Ct.* 430, 94 *L. Ed.* 653 (1950); and, see *Ker v. California, supra* (374 *U. S.,* at *pp.* 41–42, 83 *S. Ct.,* at *pp.* 1634–1635, 10 *L. Ed. 2d,* at *p.* 743); *People v. Maddox,* 46 *Cal. 2d* 301, 294 *P. 2d* 6 (*Sup. Ct.* 1956), *cert.* denied 352 *U. S.* 858, 77 *S. Ct.* 81, 1 *L. Ed. 2d* 65 (1956). In *United States v. Rabinowitz,* the United States Supreme Court said:

"A rule of thumb requiring that a search warrant always be procured whenever practicable may be appealing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. It is fallacious to judge events retrospectively and thus to determine, considering the time element alone, that there was time to procure a search warrant. Whether there was time may well be dependent upon considerations other than the ticking off of minutes or hours. The judgment of the officers as to when to close the trap

on a criminal committing a crime in their presence or who they have reasonable cause to believe is committing a felony is not determined solely upon whether there was time to procure a search warrant. Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraint criminal laws are essential.

It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. It is not disputed that there may be reasonable searches, incident to an arrest, without a search warrant. Upon acceptance of this established rule that some authority to search follows from lawfully taking the person into custody, it becomes apparent that such searches turn upon the reasonableness under all the circumstances and not upon the practicability of procuring a search warrant, for the warrant is not required. * * * The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. * * *" 339 *U. S.*, at *pp.* 65–66, 70 *S. Ct.*, at *p.* 435, 94 *L. Ed.* 653.

It is important to note also that when a person is arrested lawfully, with or without a warrant, a search of his person or of the things within his immediate possession or control, or of the place of arrest to the extent that it is within his immediate possession or control, is considered incidental to the arrest. The rule was stated broadly in *Rabinowitz* as follows:

"The right 'to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was committed' seems to have stemmed not only from the acknowledged authority to search the person, but also from the long-standing practice of searching for other proofs of guilt within the control of the accused found upon arrest. Weeks v. United States, 232 U. S. 383, 392, 58 L. Ed. 652 [655], 34 S. Ct. 341, 344. It became accepted that the premises where the arrest was made, which premises were under the control of the person arrested and where the crime was being committed, were subject to search without a search warrant." 339 *U. S.*, at *p.* 61, 70 *S. Ct.*, at *p.* 433, 94 *L. Ed.* 653.

Obviously the search of the relatively small Doyle apartment, and particularly of the kitchen, was well within the outer limits of such a search. *Preston v. United States, supra; Ker v. California, supra; Abel v. United States,* 362 *U. S.* 217, 80 *S. Ct.* 683, 4 *L. Ed. 2d* 668 (1960); *Draper v. United*

*States,* 358 *U. S.* 307, 79 *S. Ct.* 329, 3 *L. Ed. 2d* 327 (1959); *Marron v. United Slates,* 275 *U. S.* 192, 48 *S. Ct.* 74, 72 *L. Ed.* 231 (1927); *Agnello v. United Stales,* 269 *U. S.* 20, 46 *S. Ct.* 4, 70 *L. Ed.* 145 (1925); *Carroll v. United States,* 267 *U. S.* 132, 45 *S. Ct.* 280, 69 *L. Ed.* 543 (1925).

▮ The further claim that the search and seizure were illegal because the officers failed to announce themselves and ask to be admitted to the premises before effecting their entry, cannot be sustained. The officers had strong basis for a belief that an abortion had been committed there. It was not unreasonable to believe that an identifying declaration and request for admittance to this second floor apartment would result in the destruction, elimination or secretion of at least some incriminating evidence. Moreover. they did not break into the house. The front door was opened in response to a ringing of the bell which enabled them to enter without breaking in. The proof supports the view that as they entered and either before starting up the stairway to the Doyle apartment or as they were ascending it, an identifying announcement was made. Assuming that a duty to request admittance exists in some situations (see dissent, *Ker v. California, supra* (374 *U. S.,* at *pp.* 44–46, 83 *S. Ct.,* at *pp.* 1635–1636, 10 *L. Ed. 2d,* at *pp.* 745, 746)), we think here the nature of the offense, the exigencies of the situation and the conduct of the officers were such that their search following the arrest should not be adjudged constitutionally impermissible. *State v. Smith,* 37 *N. J.* 481, 497–500 (1962).[1]

▮ The foregoing discussion brings us to the crucial aspect of the case: Was the arrest of the defendants without a warrant lawful? As the Chief Justice noted in his extensive discussion of the problem in *State v. Smith, supra,* under the common law a peace officer has authority to arrest without a

---

[1] For a recent illuminating discussion of this problem, see Blakey, "The Rule of Announcement and Unlawful Entry," 112 *U. Pa. L. Rev.* 499 (1964).

warrant when he has a reasonable basis to believe a felony is being or has been committed, and when he has a reasonable basis to believe that the person to be arrested is committing or has committed it, even though it is not being or has not been committed in his presence. 37 *N. J.*, at *p.* 493; *A. L. I. Code of Criminal Procedure,* § 21 (1930); *Restatement, Torts,* § 121, *p.* 259 (1934); *Uniform Arrest Act,* § 6; 28 *Va. L. Rev.* 315 (1942); 6 *C. J. S. Arrest* § 6b, *p.* 601 (1937). "Reasonable basis" is another way of saying probable cause, which cause is said to exist where the facts and circumstances within the arresting officer's knowledge and of which he had reasonably trustworthy information are sufficient in themselves to warrant the belief in a man of reasonable caution that a felony is being or has been committed. *Carroll v. United States, supra* (267 *U. S.*, at *p.* 161, 45 *S. Ct.*, at *p.* 288, 69 *L. Ed.*, at *p.* 555).

The English common law divided crime into three major groups: treasons, felonies and misdemeanors. 1 *Burdick, Law of Crime,* § 75 (1946); *Perkins, Criminal Law, pp.* 8–10 (1957); 1 *Wharton, Criminal Law and Procedure.* § 26 (*12th ed.* 1957); 10 *Halsbury's Laws of England, p.* 293 (*3d ed.* 1955). It is impossible to find an exact and all inclusive definition of felony or one upon which all the text writers agree. Wharton says the common law connotation is "lost in the shrouds of antiquity." *Op. cit.* § 28, *p.* 58. Blackstone's definition which, with some qualifications not important for our purposes, authorities generally seem to accept is that a felony was an offense which occasioned total forfeiture of either lands, or goods, or both; and to which capital or other punishment might be added according to the degree of guilt. 4 *Blackstone, Commentaries on the Laws of England* 95 (1765); 4 *Chitty's Blackstone* 67 (1895); *Bannon v. United States,* 156 *U. S.* 464, 467, 468, 15 *S. Ct.* 467, 39 *L. Ed.* 494 (1895). Forfeiture for felony has long since been abolished in England and the United States. 22 *C. J. S. Criminal Law* § 6. Moreover, the significance of "felony" has been redefined in this country in many jurisdictions either by judicial decision

or by statute. The trend in that direction has been so marked that Mr. Justice Frankfurter, in *Adams v. United States*, 317 *U. S.* 269, 272, 63 *S. Ct.* 236, 238, 87 *L. Ed.* 268, 271 *fn.* 2 (1943), was prompted to speak of felony as "a verbal survival which has been emptied of its historic content." And, see *Perkins, supra,* at *p.* 12.

▪ Judicial decision generally in this country has regarded a felony as any criminal offense for which the defendant may be executed or imprisoned in the state prison. For example, see: *Eckhardt v. People,* 126 *Colo.* 18, 247 *P. 2d* 673 (*Sup. Ct.* 1952); *Hill v. State,* 164 *Ga.* 298, 138 *S. E.* 229 (*Sup. Ct.* 1927); *State v. Vashon,* 123 *Me.* 412, 123 *A.* 511 (*Sup. Jud. Ct.* 1924); *State v. McCormick,* 84 *Me.* 566, 24 *A.* 938 (*Sup. Jud. Ct.* 1892); *State v. Siegel,* 265 *Mo.* 239, 177 *S. W.* 353 (*Sup. Ct.* 1915); *Rains v. State,* 142 *Neb.* 284, 5 *N. W. 2d* 887 (*Sup. Ct.* 1942); *State v. Harwood,* 206 *N. C.* 87, 173 *S. E.* 24 (*Sup. Ct.* 1934); *Smith v. State,* 115 *Tex. Cr. R.* 88, 29 *S. W. 2d* 350 (*Crim. App.* 1930); *Benton v. Commonwealth,* 89 *Va.* 570, 16 *S. E.* 725 (*Sup. Ct. App.* 1893); 22 *C. J. S. Criminal Law* § 6, *p.* 14. Many statutes classify offenses as felonies on the same basis. *Barrett v. People,* 136 *Colo.* 144, 315 *P. 2d* 192 (*Sup. Ct.* 1957); *People v. O'Connor,* 414 *Ill.* 51, 110 *N. E. 2d* 209 (*Sup. Ct.* 1953); *In re Stevens,* 52 *Kan.* 56, 34 *P.* 459 (*Sup. Ct.* 1893); *State v. Spivey,* 213 *N. C.* 45, 195 *S. E.* 1 (*Sup. Ct.* 1938); *Ex Parte Thorpe,* 137 *Ohio St.* 325, 30 *N. E. 2d* 335 (*Sup. Ct.* 1940); *State ex rel. Grievance Committee of State Bar Ass'n v. Biggs,* 52 *Or.* 433, 97 *P.* 713 (*Sup. Ct.* 1908); *Benton v. Commonwealth, supra; Clark and Marshall, Crimes, pp.* 96, 99 (*Wingersky ed.* 1958); *Burdick. supra,* § 80; *Wharton, supra,* § 28, *fns.* 12, 13. In New York a felony is a crime which is or may be punishable by death or imprisonment in a state prison. 39 *McKinney's Consolidated Laws of New York, Penal Law,* § 2. On the federal scene Congress has declared any offense punishable by imprisonment for a term exceeding a year to be a felony. 18 *U. S. C.* § 1. The Model Penal Code designates a crime as a felony "if the person convicted thereof

may be sentenced to imprisonment for a term \* \* \* in excess of one year." § 1.04(2) (1962).

Criminal codes in New Jersey have not utilized the felony-misdemeanor nomenclature or classification of the English common law. See, *e. g.,* "An Act for the punishment of crimes," adopted March 18, 1796, *Paterson's Laws of New Jersey* 208 (1800); *Brown v. State,* 62 *N. J. L.* 666, 695 (*E. & A.* 1899); *Leeman v. Public Service Ry. Co.,* 77 *N. J. L.* 420 (*Sup. Ct.* 1909). Our present crimes act makes all criminal offenses (other than treason, *N. J. S.* 2A:148-1, and murder, *N. J. S.* 2A:113-1 *et seq.*) misdemeanors or high misdemeanors, *N. J. S.* 2A:85-1 to 12. All common law offenses of an indictable nature not expressly provided for by statute are denominated misdemeanors. *N. J. S.* 2A:85-1. Petty offenses are designated disorderly person offenses. *N. J. S.* 2A:169-1 *et seq.* Misdemeanors, with rare exceptions, are punishable by a fine of not more than $1,000 or imprisonment for not more than three years, or both. *N. J. S.* 2A:85-7. High misdemeanors, which under the statute are not in any way equated with common law felonies, are punishable generally by a fine of not more than $2,000 or imprisonment for a maximum term of seven years, or both. *N. J. S.* 2A:85-6. Disorderly persons may be punished by a fine of not more than $1,000 or incarceration in the county workhouse, penitentiary or jail for not more than one year, or both. *N. J. S.* 2A:169-4.

The described classification and the absence of a specific "felony" category in our crimes act create a necessity for decision with respect to the kind of offense which will justify a police officer in arresting without a warrant. As has been shown above, most jurisdictions, either by statute or judicial declaration, regard an offense which may be punished by confinement in a state prison as sufficient for such purpose. In New Jersey a disorderly person infraction is not a crime and does not carry the stigma or disqualification associated with conviction of crime. Although it may be punished by a maximum term of one year, the imprisonment must be in a county

institution and not the state prison. It would seem, therefore, that in our State statutory authorization for a more severe penalty, *i. e.,* for more than a year and in a state prison, ought to be regarded as necessary. *Cf. N. J. S.* 2A:164–15, 17. Misdemeanors under the crimes act which are punishable by imprisonment for more than a year in state prison, in our judgment, and we so hold, are sufficiently equatable with common law felony to justify arrest by a peace officer without a warrant when he has reasonable ground to believe that an offense of that grade is being or has been committed by the person to be apprehended. See *State v. Smith, supra* (37 *N. J.,* at *p.* 494). Such a rule conforms with the federal statute, the proposal of the Model Penal Code and, in the light of the development of the criminal law in our State, represents a proper association between the common law test and our crimes act.

Abortion is a high misdemeanor. *N. J. S.* 2A:87–1. Thus the rule we now adopt is applicable to the present case. *Cf. State v. Smith,* 32 *N. J.* 501, 531 (1960). And, since the arresting officers did not have a warrant, the crucial issue becomes: Did they have reasonable ground to believe that Dr. Doyle had performed an abortion, and that Mrs. Doyle had assisted and participated in its commission? Our study of the evidence satisfies us that the officers were amply justified in making the arrests.

The affidavit of Detective Richard Kikkert submitted to obtain a search warrant recites that information had been received from a reliable source that an abortion would be performed at 12 Addison Avenue, Rutherford, New Jersey (the Doyle address) on December 2, 1960. While the address was under surveillance in the evening of that day, two women alighted from an automobile and entered the house. After several hours they emerged and walked down the porch steps with Dr. Doyle assisting Mrs. Fealey. The subsequent events, already described, which followed a very few minutes thereafter produced admissions by both women that Mrs. Fealey had been aborted by Dr. Doyle with Mrs. Doyle and

Mrs. Intrieri assisting in the act, and that $150 had been paid for the abortion. This information provided adequate basis for the belief by the officers that Dr. and Mrs. Doyle had committed an abortion, that is, an offense which justified an immediate return to the Addison Avenue address and the arrest of the Doyles. The fact that some of their information was hearsay did not deprive it of probative efficacy in establishing probable cause for the arrests. *Ker v. California, supra; Draper v. United States, supra.* The arrests being valid we have no difficulty in concluding under the cases already cited that the search and seizure of the various articles produced at the trial were incidental to the arrest. Not only was the search incidental but we find as well that it was reasonable in extent under the circumstances of the case. As a consequence, defendants' argument that the trial court erroneously admitted the articles in evidence cannot be sustained.

## II.

Numerous alleged trial errors raised in the Appellate Division are covered again in defendants' brief in this Court. We have examined them and are satisfied that they were properly disposed of by Judge Foley's opinion. *77 N. J. Super.,* at *pp.* 336–341. Our examination of the entire record satisfies us that defendants suffered no prejudicial error in the admission or rejection of evidence, or any other aspect of the case. Moreover, the conclusion is inescapable that the facts and circumstances established at the trial pointed strongly to the result reached by the jury.

The judgments of conviction are affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.