114 N.J. Super. 306 (1971)
276 A.2d 175
THE BOARD OF EDUCATION OF NEWARK IN THE COUNTY OF ESSEX, A CORPORATION, ETC., PLAINTIFF-RESPONDENT,
v.
NEWARK TEACHERS UNION, LOCAL NO. 481, AMERICAN FEDERATION OF TEACHERS, A.F.L.C.I.O., ETC., ET AL., DEFENDANTS. IN THE MATTER OF NEWARK TEACHERS UNION, LOCAL 481, AMERICAN FEDERATION OF TEACHERS, A.F.L.C.I.O., ETC., AND ONE HUNDRED EIGHTY FIVE (185) OTHERS, APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 1971.
Decided April 5, 1971.
*308 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Seymour Cohen argued the cause for appellants.
Mr. R. Benjamin Cohen, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County *309 Prosecutor, attorney; Mr. Bruce P. Miller, Assistant Prosecutor, of counsel and on the brief).
The opinion of the court was delivered by CONFORD, P.J.A.D.
This is an appeal by the defendant union and 185 individual defendants from summary adjudications of contempt of court and sentences pursuant thereto for violation of a January 31, 1970 order of the Chancery Division restraining defendants from engaging in a strike against the Newark Board of Education. The issues projected on the appeal are narrow. Prohibited picketing by most of the defendants is in effect conceded in the single brief filed on behalf of all defendants.
A quotation from defendants' brief well sets the background against which the issues before us must be considered:
On the following day (February 1) at a meeting sponsored by the Newark Teachers Union, held at the Military Park Hotel in Newark, attended by 2,000 or more people, covered by all major television and radio networks and newspapers in the New York metropolitan area, a strike was called. On the following day, Monday, More than 3,000 of the approximately 4,000 school teachers of the Newark school system did not report to their classrooms. That situation with some up and down fluctuations remained fairly constant throughout the four weeks of the strike.
The foregoing may be supplemented by the fact that at the February 1 (Sunday) union mass meeting the president of the union, Carol Graves, told the audience that the union had been served with the restraining order but that it would strike anyway as the only means of redress of its grievances.
The restraining order was broad and comprehensive. It was directed against the union, the New Jersey State Federation of Teachers, "their respective members, officers, directors, committee members, employees, agents and representatives," (there followed the names of 11 individuals) "and all persons acting in behalf of or in concert or participation *310 with the said defendants or the said members, officers," etc. Among the acts that were prohibited were:
1. Causing, instigating, promoting, sanctioning, authorizing, carrying on, participating in, fostering, continuing, lending support or assistance to or aiding or abetting any strike, sitdown, slowdown, work stoppage or other impediment to work, against the plaintiff or by any employee or employees of the plaintiff;
2. Picketing, congregating, parading, patrolling, loitering, gathering, or walking back and forth,  or causing, instigating, promoting, encouraging, sanctioning, intimidating, coercing, counselling or authorizing any person or persons to picket, congregate, parade, patrol, loiter or walk back and forth,  in front or in the vicinity of the public schools, buildings, grounds, playgrounds, yards, or premises of the plaintiff or operated or administered by the plaintiff, or in front of any buildings, grounds, playgrounds and premises on or at which any instructional or guidance program is conducted by plaintiff;
3. Interfering with, obstructing, impeding, or delaying, or attempting to interfere with, obstruct, impede or delay the plaintiff in the performance of any of its duties and functions or in the conduct of the Newark public school program; * * *
7. Agreeing, conspiring, or combining to do any of the foregoing acts, or directly or indirectly accepting, arranging for, or soliciting from any source funds or other support for the doing of any of the foregoing acts mentioned in paragraph "1" to "6", directly preceding the within paragraph "7".
While the order was to expire February 13, 1970, it was continued and ultimately made permanent.
Most if not all the individual defendants were arrested for violations of the restraint, generally when found picketing or assembling and congregating outside the schools on what normally would have been regular school days when the teacher-defendants would normally be expected to be working inside the buildings. Six officers of the union were arrested pursuant to arrest orders expressly naming them. Almost all the other individual appellants were arrested pursuant to a general arrest order issued by the Chancery Division not naming specific persons but directing the arrest by the sheriff of "any individual who in his presence or that of any member of his staff is observed to continue to violate this court's order of January 31, 1970.

*311 I
The first appellate point urged is that the general order of arrest was illegal and the State may not rely upon the "fruits" of the illegal seizures pursuant thereto  i.e., the identification of the picketing defendants. Even if the premise were conceded, the conclusion derived therefrom would not follow.
Even if the general order be invalid for failure to name or identify particular persons to be arrested, cf. West v. Cabell, 153 U.S. 78, 85-86, 14 S.Ct. 752, 38 L.Ed.2d 643 (1894); Fisher, Laws of Arrest 107 (1967), we do not find the arrests invalid. An arrest not supportable under a warrant therefor will not be held invalid if there is another basis upon which to sustain it. Cf. State v. Masco, 103 N.J. Super. 277, 282 (App. Div. 1968). Here there is.
The common law made a distinction between felonies and misdemeanors for purposes of distinguishing the criteria for authorization of an arrest by a peace officer without a warrant. In the case of the former the test was probable cause to believe the arrestee had committed or was committing the offense; in the latter, whether the offense was being committed in the officer's presence. State v. Smith, 37 N.J. 481, 494-495 (1962), cert. den. 374 U.S. 835, 83 S.Ct. 1879, 10 L.Ed.2d 1055 (1963). In State v. Doyle, 42 N.J. 334 (1964), the dichotomy between "felonies" and "misdemeanors" for the foregoing purposes was transmuted into one between offenses punishable by incarceration in state prison for more than one year and those not so punishable. Id. at 349. In the present case, since the alleged offenses by defendants were specified by the court's order to be prosecuted summarily by the court without initial indictment by grand jury and trial by jury, the maximum potential incarceration for guilt became limited to six months. In re Buehrer, 50 N.J. 501 (1967). Consequently, applying the criterion of Doyle, supra, these alleged offenses fell into the category wherein the peace officers could arrest only *312 if the offenses were committed in the presence of the officers. It is our conclusion that they did.
The term "presence" sums up the requirement that the officers knew of the criminal event by the use of their senses. State v. Smith, supra, 37 N.J. at 495. The criminal event in the present case would be any objective conduct by an individual which an officer could fairly conclude was violative of the restraining order. Picketing, with or without the carrying of signs, would obviously be such. The order also contains prohibitory language broadly referable to the ordinary common-law concept of aiding and abetting. Individuals assembling or milling about in groups outside schools or school administration buildings, inferably to deter teachers or other school personnel from attending to their duties or to encourage others to continue with their participation in the union endeavor to carry on the strike, can fairly be said to be aiding and abetting the violation of the restraining order by others as well as directly violating it themselves. We therefore conclude the offenses by those defendants who were arrested were being committed in the presence of the arresting officers and that the arrests were consequently valid.
This makes it unnecessary for us to consider what seems to us at least a dubious proposition  that if the arrests were illegal the convictions were achieved with the aid of the illegal "fruits" thereof in the form of "identification" of the wrongdoers.

II
Defendants contend that they were convicted of contempt of court because of absence from the classroom although they were never charged with that act.
We do not find that any defendant was convicted of contempt for absence from the classroom per se as an act of disobedience of the restraining order. It is evident from the totality of the findings in each case that evidence of absence from the classroom by teacher defendants, coupled *313 with proof that the absentee had failed to comply with a school regulation requiring explaining absences to the principal of the school, and in the light of all the other evidence in the case, was taken as a sufficient showing to justify the ultimate determinative finding that the particular absent defendant was participating, directly or indirectly, in the strike, contrary to the restraining order.
That the several trial judges entertained this conception is illustrated by Judge Mintz' comment at the outset of the Kirschbaum hearing: "* * * we'll proceed on the theory that the Order to Show Cause charges this defendant with unlawful picketing in front of the Lafayette Street School on February 19, 1970 and unlawful absence from his classroom as part of a strike movement on the part of Local Union 481" (Emphasis added).
Again, "Now, the contention of the State is that this defendant by absenting himself unlawfully or without justifiable reason from the classroom aided and abetted in a strike." (Emphasis added)
Thus it was the ultimate determination, expressly or impliedly, of participation in the strike which underlay each adjudication of contempt.
The vast majority of the individual defendants were proven to have been picketing, and as to these there can be no question that the adjudications of contempt were unexceptionable. Defendants' brief names eight defendants who assertedly were not proven involved in picketing but were convicted solely on the allegedly uncharged offense of absence from school. Those so named are defendants Raymond Kirschbaum, Fred Klock, Dorothy Bergman, Ellen Asselmeyer, James Peluso, Marilyn Lago, Maria Mirabella and Alan Yablonsky. The specific evidence and findings as to these were as follows:
Kirschbaum. On February 19 he was loitering as one of a group of three persons across the street from Lafayette School whereas his place of employment as a teacher was *314 East Side High School. He was found not to have been "picketing" as such "in front of" Lafayette School. He was found to have absented himself from classes without cause or notice.
Klock. He was observed on February 19 driving a car in front of the Summer Avenue School and waving his left arm out the car window. He was then seen to stop his car in front of the school and blow the car horn while continuing to wave his arm. A number of persons, including several of the other defendants who had been walking in front of the school, moved out of their line upon hearing Klock. Klock was then arrested. There was also evidence that Klock was assigned to Barringer High School, and was absent without notice from February 2 to 25, 1970. On the basis of this evidence a trial judge found that Klock was probably "the lookout for picketers at or near Summer Avenue School"; he interpreted the evidence against Klock as indicating that the defendant "would blow his [car] horn and wave his hand to direct picketers to leave when the official car was arriving in the area."
Bergman. Several officers and detectives saw her at the Summer Avenue School on February 19 wearing a sign referring to the teachers' union and standing near an automobile occupied by two other persons. There was also evidence that she had been absent from the Boylan Street School without notice from February 2 to 25. A trial judge found that she had been "present with a picket sign near the Summer Avenue School after some of her colleagues had been arrested," in addition to having participated in the strike with knowledge of the restraining order.
Asselmeyer and Peluso. These defendants were the two persons in the car next to which defendant Bergman was arrested. The evidence against them was that a sign referring to the strike was seen in the car which they occupied, and upon the arrest of Miss Bergman the car drove away from the Summer Avenue School. A detective gave chase in his *315 vehicle and apprehended Peluso and Asselmeyer several blocks from the school. There was also evidence that Peluso was absent without explanation from his assigned duties at Abington Avenue School from February 2 to 25, and that Asselmeyer was absent throughout the same period from the Boylan Street School. The trial judge found that these two defendants
* * * were observed on February 19, 1970 in the area of Summer Avenue School. Mrs. Asselmeyer was wearing a picket sign, and Mr. Peluso accompanied her in an automobile in which the picket sign was located. From this it can be inferred that they had picketed in the area of Summer Avenue School, but, in any event, they were out of school despite knowledge of the restraining order, and by staying out in concerted fashion with their colleagues until February 26, as a result of the strike call on February 1 at the union meeting, they were thereby also guilty of violating the order.
The trial judge found that an inference of picketing by these defendants was permissible and that they had concertedly violated the restraint.
Lago, Mirabella and Yablonsky. There was evidence that they were seen standing in front of Immaculate Heart of Mary Church, across the street from the Lafayette Street School, on February 19. There were no pickets immediately in front of that school. As a vehicle bearing Essex County Sheriff's markings approached the school, the three named defendants ran into the church; after the marked vehicle left the area of the school and church they returned to the sidewalk in front of the church. They were subsequently arrested. There was also evidence that Yablonsky was absent from his South Street School duties from February 2 to 25 without notice to the principal, and that Marilyn Lago and Maria Mirabella were inexcusably absent from their duties at the Oliver Street School during that same period, although Marilyn Lago did call in sick from February 19 to 25. The trial judge found that the evidence sustained the charge that these defendants were picketing, congregating, parading, etc. "in the vicinity" of a Newark public school.
*316 We conclude that all the defendants, including those specifically mentioned above, were properly found guilty of contempt of court in that the proofs justified beyond a reasonable doubt findings that they violated the restraining order by willfully participating in or aiding and abetting the strike in one or more of the ways prohibited by the restraining order.
Pursuant to our appellate responsibility under N.J.S.A. 2A:10-3 and R. 2:10-4; Sarner v. Sarner, 28 N.J. 519, 525 (1959), app. dism. 359 U.S. 533, 79 S.Ct. 1137, 3 L.Ed.2d 1028 (1959), reh. den. 360 U.S. 940, 79 S.Ct. 1446, 3 L.Ed. 2d 1552 (1959); State v. Gussman, 34 N.J. Super. 408 (App. Div. 1955), and Zimmerman v. Zimmerman, 12 N.J. Super. 61, 69 (App. Div. 1950), we have reviewed the evidence in all the cases de novo on the record and concur in the findings below of guilt of each of the defendants of contempt of court beyond a reasonable doubt.

III
Defendants contend they were improperly convicted of contempt in that they were afforded no or inadequate notice of the offense or offenses they were charged with. We do not agree.
Specifically, defendants contend the requirements of R. 1:10-2, governing summary contempt proceedings, were not observed by the State. The rule requires the court to institute the proceedings by order for arrest or order to show cause "specifying the acts or omissions alleged to have been contumacious." The arrest order of February 10 recited sworn allegations that "illegal picketing has been and is being conducted on a well-organized plan." The complaints filed against particular defendants charged assembling with others and picketing at named locations. Each defendant was later served with an "order continuing arrest" charging them, knowing of the existence and content of the restraining order of January 31, with (a) carrying on and participating *317 in a strike against the board of education; (b) picketing, congregating and assembling at a specific location in front of a school or board of education building, and (c) obstructing and impeding the board of education in conducting its functions and programs.
We are satisfied that the foregoing, in totality, adequately apprised the defendants of the charges on which they would be tried and met the spirit and intent of R. 1:10-2 as well as defendants' rights to due process.

IV
Defendants contend that the sentences imposed were "arbitrary and excessive." The sentences imposed were, for the most part, ten days in jail and a fine of $200. Up to three months in jail and $500 fines were imposed upon union leaders. The union was fined $40,000. The argument is that the sentencing motivations were "subjective," whereas they should have been exclusively based on the "objective" facts; that the defendants were being punished essentially for striking rather than for violating the restraint.
The assertions are not soundly conceived. Sentences were in all cases based upon the violation of the restraint although the effect of the contempt on the public interest was undoubtedly in the minds of the sentencing judges, having been expressly mentioned in some instances. Defendants' apparent argument  that the nature and effect of the conduct restrained by the order contemned is irrelevant to appropriate punishment for the contempt  is ill founded. Were it accepted, all criminal contempts of court would be punished relatively uniformly, all being theoretically merely the affront to the dignity of the court. The law is otherwise. The public interest in the subject matter of the restraint is a highly relevant factor in assessing punishment for the contempt. In re Buehrer, supra, 50 N.J. at 507, 508. There is no more important public interest than the freedom from interruption in, or the disruption of, the *318 education of school children. See N.J. Const., Art. VIII, § IV, par. 1.
It is our duty as an appellate court in summary contempt cases to adjudge punishment as well as guilt. N.J.S.A. 2A:10-3; R. 2:10-4. Sarner v. Sarner, supra; Zimmerman v. Zimmerman, supra. We have hereinabove adjudicated guilt of all defendants. After assaying the whole record and considering the appellate arguments we concur in the sentences severally imposed on each of the defendants by the respective trial courts which are herewith incorporated by reference into this determination. All pending stays are vacated. Fines are to be paid forthwith if not already paid. Jail terms shall be served commencing July 12, 1971.
So ordered.