Dennis George KING, Petitioner,

v.

Warren PINTO, Superintendent, New Jersey Prison Farm, Rahway, New Jersey, Respondent.

Civ. A. No. 817-65.

United States District Court
D. New Jersey.

July 25, 1966.

November, 1965 a creditor of Raywal offered $14,000 for the remainder of the mortgaged assets.

Ralph J. Kmiec, Camden, N. J., for petitioner.

Solomon Forman, Deputy Atty. Gen., Atlantic City, N. J., Ernest M. Curtis, Atlantic County, N. J., of counsel for respondent.

## OPINION and ORDER

COHEN, District Judge:

Petitioner, Dennis George King, seeks a *Writ of Habeas Corpus*, under 28 U.S.C. 2241 et seq., inquiring into the legality of his detention at the New Jersey State Prison Farm, Rahway, New Jersey. He urges that he was victimized by an unlawful search and seizure, and that his privilege against self-incrimination was violated by the improper manner in which the police conducted a "lineup" resulting in his identification as an armed robber.

An Order issued out of this Court directed to Respondent to appear and show cause why, if petitioner's allegations were sustained, the writ should not issue. On an adjourned day testimony was taken on behalf of both the petitioner and the State of New Jersey, and oral arguments were made by respective counsel who subsequently filed briefs.

As stated in the Court's memorandum issuing the Order to Show Cause, this matter has a history.[1] In addition to the issues raised in the State Courts, the present proceeding includes that of an asserted improper use at trial of petitioner's admission of ownership of items seized at his apartment, being a revolver, a rain cap and a raincoat, in violation of the rule of law declared in Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964). And while in the strict sense, petitioner may not have exhausted remedies available to him

within the state courts, there was not an intentional by-pass of the state courts as the remedy may have been illusory at the time of the filing of his petition. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). cf. United States ex rel. Russo v. State of New Jersey (United States ex rel. Bisignano v. State of New Jersey) 351 F.2d 429 (3 Cir. 1965), and State v. Coleman, 46 N.J. 16, 35–38, 214 A.2d 393 (1965). The constitutional dimensions of this issue, along with other issues, bring it within the reach of federal jurisdiction. While this Court does not sit in review of those issues determined in the state courts, the present application presents questions of such federal constitutional impress, Mapp v. State of Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), that deferential comity between Federal and State Courts must give way to independent fact finding. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Green v. Yeager, 223 F.Supp. 544, 546 (D.N.J.1963), affirmed per curiam, 332 F.2d 794 (3 Cir. 1964). The guilt or innocence of petitioner is not an issue here; the present concern is in regard to whether or not the state conviction was based upon evidence prejudicially infected by violation of his constitutional rights.

Turning to the testimony taken in this Court, and assisted by a review of the

---

1. It was twice tried, and twice reviewed by the New Jersey State Appellate Courts. Briefly, on May 2, 1962, petitioner *pro se* stood trial in Atlantic City, New Jersey, on charges of armed robbery. N.J.S.A. 2A:141–1 and N.J.S.A. 2A:151–5. The jury could not agree upon a verdict and it was discharged. A second trial, on September 11, 1962, was conducted, petitioner being represented by competent court-appointed counsel. It resulted in a verdict of guilty, whereupon petitioner was sentenced to prison for a term of 5 to 7 years for robbery, and a term of 2 to 3 years for being armed, the sentences to run consecutively. Certain questions raised on the present application received ample review

by the Superior Court of New Jersey, Appellate Division, State of New Jersey v. King, 84 N.J.Super. 297, 201 A.2d 758 (1964), and the Supreme Court of New Jersey, State of New Jersey v. King, 44 N.J. 346, 209 A.2d 110 (1965). The Appellate Division ruled that the search and seizure was illegal, reversing the trial court, and the Supreme Court reversed the Appellate Division, holding that the fact determination by the trial court that petitioner's consent to search had been freely and voluntarily given should not have been disturbed unless such findings were "plainly unwarranted by the evidence in the record." (44 N.J. at p. 354, 209 A.2d at p. 114).

transcript of the state court proceedings, Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the following narrative appears to fashion the sequence of events. On January 15, 1962, at approximately 6:00 P.M., Mrs. Jean Ireland, the owner and operator of a dress shop in Atlantic City, New Jersey, was the victim of an armed robbery. The facts developed at trial indicate, that as she stooped to unlock the glass door at the front of her shop to let herself out, a light complexioned negro man dressed in a rain cap and trench style raincoat forced his way in at gun point and told her to "get back in there. You heard me, get back in there." (Meaning to the rear of the shop.) She grappled with the intruder, extricated herself and struggled out the door, falling to the ground. The robber rushed to her, tore her pocketbook from her grasp and made off with the week's receipts of $1,020.00.

Following report of the robbery, police investigation was initiated by Detective Robert Shepperson of the Atlantic City Police Department. On the night of the robbery, he questioned Mrs. Ireland, who being in shock and medically sedated was of little assistance to him. However, Miss Pearl Hamm was returning from a local movie theatre at the time and place in question and stated that she saw petitioner, known to her but not by name, coming from the direction of the dress shop wearing a rain cap and raincoat, which garb she identified at trial. Detective Shepperson's investigation also led to Mrs. Helen Clancy, who had worked at the shop that day. She stated that she left the shop at 6:00 P.M., somewhat concerned about leaving Mrs. Ireland alone. As she was departing, she noticed a man standing in the doorway next to the shop; he was wearing an unbuttoned rain cap and raincoat. She looked at him several times, as a street lamp shone on his face disclosing sharp features, which she later identified with the petitioner.

The night after the robbery, Miss Hamm and Mrs. Clancy were shown "mug shots" by the police, among which was a photograph of the petitioner. They both identified him from his photograph, as the robber. Both women were out of the presence of each other and made their separate identifications at different times. Subsequently, at a police "line-up", Mrs. Clancy further identified the petitioner as the robber, when he was required to don the described rain cap and raincoat. Additionally, when he was instructed to recite and did, the words alleged to have been uttered by the robber, "get back in there," Mrs. Ireland also made positive identification of petitioner. Thus, the record convincingly demonstrates that the raincoat and rain cap, identified as being similar to those worn by the robber, and which in addition to the seized gun were admitted by the petitioner to be his property at the time of the arrest and seizure, played an important role in his prosecution and conviction.

The events leading to the acquisition of these items are the circumstances upon which the present application must turn. Transcribed prior trial testimony in this matter affords ample backdrop against which to view the testimony received in the present proceeding. Here, petitioner maintained the same position as he did in the state proceedings. He claims that on January 17, 1962, while he was being driven to the Atlantic City Hall by Officer William Shepperson and Detective Robert Shepperson, for questioning in regard to the Ireland Dress Shop robbery, he was informed by Detective Shepperson that he was under arrest. (Detective Shepperson is the uncle of Officer Shepperson.) He denied committing the crime and insisted he didn't know where the money was. "Then we turned around to go back to the house to look for the money. I had a key to the house, the street level door, but our apartment was on the second floor." Petitioner was not handcuffed, nor was any violence or coercion exerted against him. All three, he and the police officers entered the apartment building, after using his key to open the door. Mrs. Alice Ford, with whom petitioner lived "as man and wife" was told by petitioner to get out of bed, to put

on a robe, as the police officers wanted to search the apartment. Such was the testimony of petitioner, which included a denial that he had given his consent to search the apartment.

Mrs. Alice Ford testified that petitioner left with Officer Shepperson, whom she knew, and returned shortly thereafter to the apartment. She stated she was not asked for permission to search the apartment, nor did she consent or object to it.

In the present inquiry, the testimony of both Sheppersons followed closely that given by them at both state trials, as well as at the intervening motion to suppress the physical evidence. Detective Shepperson stated that his nephew went to the front of petitioner's apartment building, and he was watching the rear to prevent escape. When petitioner was brought down to the car, he "padded him down" and told him he was under arrest for the Ireland Dress Shop robbery. He placed him in the rear of the car and he and his nephew sat in the front, and questioned petitioner for a few minutes. It was at this precise point in time that petitioner was advised of his constitutional rights. Cross examination of Shepperson by Mr. Kmiec, counsel for petitioner, in pertinent part, was as follows:

"Q. Did you ever advise him that he had a right to consult an attorney about this charge, after you placed him under arrest?

A. I told him of his rights.

Q. Did you tell him of his right to consult an attorney?

A. I did.

Q. You did?

A. Yes, I did.—told him he don't (sic) have to give a statement— he doesn't have to say anything —he didn't have to let us search the house. He said he had nothing to hide, but the house be-

longed to his girl friend—we have to ask her.

Q. You told him he had the right to remain silent, is that right?

A. Yes, and he did.

Q. Did you tell him this in the car, right after you placed him under arrest?

A. I did."

Detective Shepperson further testified that when Mrs. Ford was asked if she had any objection to their searching the apartment, she interposed none and replied that it was all right. Detective Shepperson, in the presence of petitioner, entered the bedroom. In the clothes closet he found the raincoat and rain cap hanging in clear view. Rummaging through a bundle of clothes, he discovered a fully loaded revolver, with additional shells, wrapped in a plastic bag secreted on the closet shelf. Petitioner admitted that these things belonged to him, and that he was holding the revolver as collateral for a loan made to a friend. These items and petitioner were taken to police headquarters within a half hour of the arrest.

Late next morning, preceding formal interrogation by the police, petitioner was carefully advised once more of his right to remain silent; that if he made any statement, it would have to be freely and voluntarily given, without threat or promise of reward and with knowledge that it could be used against him in court; further, that he was entitled to the services of an attorney, if he so desired. Petitioner indicated that he understood his rights, but that he didn't desire an attorney.[2]

■■ Such then are the events and surrounding circumstances against which the constitutional issues must be gauged. And while it is true, that credibility is always a decisive factor when testimony is in conflict, as here, on issues involving fundamental constitutional rights design-

2. He refused appointment of an attorney at the plea and first trial, and acted as his own Defense Attorney, not without some measure of success, for the jury could not agree upon a verdict.

ed to protect individual liberties, something more than a mere choice of testimonial version of the facts is required in the fact finding process. That additional requisite in the constitutional atmosphere of individual liberties, when a person is charged with the commission of a crime, is the judicious assessment in depth of all the circumstances in the particular case, having in mind the paramount rights of the individual to be secure in his person and property, which rights are the essence of our constitutional form of government. Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1962); Miranda v. Arizona, Nos. 759, 760, 761 and 584, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, decided June 13, 1966. In this pursuit, examination has been made of the entire record, including the findings of the New Jersey Courts, to determine whether the evidence seized from petitioner was constitutionally admissible under the circumstances of this case. Ker, supra, 374 U.S. at page 34, 83 S.Ct. 1623. As stated by the Supreme Court in Elkins v. United States, (1960) 364 U.S. 206, at page 221, 80 S.Ct. 1437, at page 1446, 4 L.Ed.2d 1669, "a healthy federalism depends upon the avoidance of needless conflict between state and federal courts." While the constitutional mandate of the Fourth Amendment applies to the States, Mapp v. State of Ohio, supra, by imposing the same constitutional standard prohibiting "unreasonable searches and seizures," state criminal investigative procedures may properly coexist with those of the federal system, but the obligations of both are to be gauged against "the same fundamental criteria in their approaches," in the solution of crime. Mapp, supra, 367 U.S. at page 658, 81 S.Ct. at page 1693.

■ It must be remembered that not all searches and seizures are prohibited by the Constitution, only those which are unreasonable. At the core of the Constitutional Standard in the law of search and seizure is "reasonableness." Ker v. State of California, supra. As stated by the Court, Ker, 374 U.S. at pages 32, 33, 83 S.Ct. at pages 1629–1630:

"Implicit in the Fourth Amendment's protection from unreasonable searches and seizures is its recognition of individual freedom. * * * While the language of the Amendment is 'general,' it 'forbids every search that is unreasonable; it protects all, those suspected or known to be offenders as well as the innocent, and unquestionably extends to the premises where the search was made' * * *. Go-Bart Importing Co. v. United States, 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931) * * * We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in light of the 'fundamental criteria' laid down by the Fourth Amendment and in the opinions of this Court applying that Amendment."

The evidence here, aside from the question of consent, as stated in Ker, 374 U.S. at pages 34, 35, 83 S.Ct. at page 1630 * * * "must be the product of a search incident to a lawful arrest, since the officers had no search warrant. The lawfulness of the arrest without warrant, in turn, must be based upon probable cause, which exists 'where "the facts and circumstances within their [the officer's] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed.'" (Citing Brinegar v. U. S., 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879 [1949]). Such is the law of arrest in New Jersey. State v. Doyle, 42 N.J. 334, 345–349, 200 A.2d 606 (1964).

■ The uncontradicted testimony in this case, is that the petitioner was one of four suspects being investigated in connection with the robbery. Detective Shepperson testified that his investigation on the night of the robbery, and the information which he was able to collate

during the next day, confirmed his suspicions regarding petitioner, and when corroborated, focused on him at approximately 12:45 A.M. on January 17, 1962. The arrest was made within 45 minutes, or at approximately 1:30 A.M. The fact that these officers may have had ample time to secure an arrest warrant during the day preceding the arrest does not render an arrest otherwise lawful, unlawful. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Ker v. State of California, supra, 374 U.S. at pp. 41–42, 83 S.Ct. at 1623. The time element here, displays a rapid sequence of events. The robbery occurred in the evening of January 15th and witnesses were interviewed then; check-out investigations were made during the next day and evening (January 16th); "mug shots", including one of petitioner, were circulated among those persons reasonably connected with the event; and when the investigation focused on petitioner after midnight, a warrant not then being feasible, the arrest was made without delay.

■■ Whether the search and seizure was proper as a lawful incident of the arrest, also depends upon "reasonableness"; they must be contemporaneous in time and place, as well as purposefully connected with the arrest. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Carroll v. United States, 267 U.S. 132, 158, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In the instant case, immediately after the arrest of petitioner at the police car in the rear of petitioner's apartment house (he shared an accommodation with his girlfriend since 1959), the arresting officers went from the parking area to his apartment on the second floor, where they gained entrance with the petitioner through his use of his key. They had asked him what he had done with the loot from the robbery, which he denied, and he assured them he knew of no money as he hadn't committed the crime for which he was being charged. Only a few minutes elapsed between the arrest and the entrance into the apartment, just a few yards distant, for the search of the premises over which he had immediate and proximate control. This sequence of events was substantially contemporaneous with the arrest. It was confined to the immediate vicinity of the arrest, the search purposefully extending into the premises over which petitioner had control, and sought the fruits of the crime. Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).[3] As stated in Doyle, supra, 42 N.J. at page 334, 200 A.2d at page 611, "It is sufficient if the valid arrest and search are reasonably contemporaneous, that is, they occur as parts of a single transaction, as connected units of an integrated incident." No geographical distance of any significance was here involved; no more "immediacy" of vicinity is reasonably conceivable, unless the arrest be made within the apartment itself as in *Ker*, supra. A more restricted construction of "immediate vicinity over which petitioner had control" as to invalidate the instant search and seizure would be unrealistic under these circumstances and would in itself, be unreasonable. Vicinity and area, are elastic terms. United States v. Lindenfeld, 142 F.2d 829, 832 (2 Cir. 1944). In the instant case, the seeking out of petitioner at his apartment, the arrest, the advice of his constitutional rights, the search of his apartment, the seizure of the items in the premises over which petitioner had control, were all part of an integrated sequence reason-

---

3. United States v. Marrese, 336 F.2d 501 (3 Cir. 1964) relied upon by petitioner, is readily distinguishable. In that case, arrest of Allen, an alleged deserter, from the Marine Corps was effected outside his apartment. Marrese and he were taken upstairs to their apartment for a search to which they did not consent. An untaxed shotgun was found which Marrese admitted belonged to him. The Court held that no probable cause existed for the search and subsequent arrest of Marrese; further, that an admission of ownership during his illegal detention was inadmissible.

ably incident and immediately connected. See State v. Doyle, supra.

Regarding the question of consent to search, several facts are revealingly significant. The arrest of petitioner followed closely upon the commission of the crime and the identification of him as the perpetrator. Petitioner lived only a few blocks from the dress shop. He was interrogated outside his home, arrested, and passed the police officers into his apartment with his own key. All of the persons connected with the event of arrest and search were known to each other. Ostensibly, the permission to search entailed in the mind of petitioner the ferretting out of the stolen money. No mention had been made of a cap and raincoat. Petitioner had no reason to suppose they had been identified by witnesses. That these items were discovered was not unusual, as they were hanging unpretentiously in clear view in an open bedroom closet. While the gun was not, being hidden under clothes, petitioner could readily explain his possession of it. It may be assumed that he knew no loot would be discovered, as in fact it was not.

Petitioners' challenge of the admissibility of the seized items, identified by witnesses as being similar to those worn by the robber, must fail. Caldwell v. United States, 338 F.2d 385, 390 (8 Cir. 1964); United States v. Chibarbo, and United States v. Scarbrough, 361 F.2d 365 (3 Cir. 1966).

■ The case of Escobedo v. State of Illinois, supra, relied on by petitioner to foreclose use of his admissions of ownership is inapposite. The ruling of *Escobedo* does not require the presence of legal counsel at the moment of arrest and seizure. In any event, the present petitioner at the very moment of arrest was promptly and specifically advised of his rights to counsel, to remain silent, and to deny the request of the arresting officers for permission to search his apartment. He relinquished known constitutional rights. The fruits of that search were the gun, an instrumentality of the crime,

and the clothing, not an instrumentality but an evidentiary link connected to the crime by eye witnesses, and to all of which he freely permitted search and seizure, as well as admitted ownership thereof. Consequently, use of these items at trial was not violative of petitioner's constitutional rights.

■ The remaining issue raised by petitioner aside from the seizure, is that the use of his clothing and voice demonstration in the police line-up violated his rights against self-incrimination under the 5th Amendment. This assertion cannot prevail. Neither of these means employed by the police in their investigation of the crime is violative of the 5th Amendment. Neither is within the concept of unconstitutional testimonial compulsion. Being non-testimonial in character, they are outside the scope of the privilege against self-incrimination. Such is the historic, as well as the prevailing view. See 8 Wigmore, Evidence § 2250 (McNaughton rev. 1961); McCormick, Evidence § 126; Maguire, Evidence of Guilt § 2.04 (1959); Weintraub, "Voice Identification, Writing Exemplars and the Privilege Against Self-Incrimination," 10 Vanderbilt Law Review 485, 486–490 (1957); State v. King, 44 N.J. 346 at 357–358, 209 A.2d 110 (this case). See also, State v. Papitsas, 80 N.J.Super. 420, 194 A.2d 8 (App.Div. 1963); N.J.S. 2A: 84A–19, N.J.S.A., Rule 25; Chibarbo and Scarbrough, supra (3 Cir. 1966).

Every facet of this case has received careful consideration to determine whether any constitutional rights of petitioner have been violated and whether the use of evidence at trial was improperly prejudicial in effecting his conviction. It is the opinion of this Court, that no such constitutional violation occurred, nor did prejudicial error by improper use of evidence result in his conviction. The arrest was proper and for probable cause; the search and seizure under all of the circumstances were incidental and reasonable; consent to the search and seizure, was secured without duress or other form of intimidation at

a time and in a circumstance where and when petitioner was informed and intelligently, knowingly and voluntarily elected not to exercise known rights. His guilt or innocence of the crime charged was not in issue in this Court; the dimensions of the state court proceedings were examined, however, in fullest constitutional spectrum and found not to have been violative of any of petitioners constitutional rights.

Accordingly, and for the foregoing reasons, the petition for the issuance of a *writ of habeas corpus* will be denied.

Therefore, it is ordered on this 25th day of July, 1966, that the petition by Dennis George King for a *writ of habeas corpus* be and is hereby denied.